THE AMERICAN INSURANCE COMPANY OF NEW-YORK
v. BRYAN & MAITLAND.

Where goods shipped for transportation are insured against loss by *thieves*, the assured is entitled to recover if he establish a *prima facie* case of loss by *theft*, without showing that the goods were taken by *assailing thieves*, robbing the vessel by violence from without: A contrary doctrine found in elementary works has probably been advanced, without adverting to the difference in the *terms* of the contract of assurance used in England and America, and the same contract generally in use on the continent of Europe.

So where the policy provides against the *barratry* of the master and mariners, the assured is entitled to recover if a loss happen by *theft*, without proving due care, vigilance, and skill on the part of the master and mariners.

If, in either case, circumstances exist excusing the *insurer* from liability on the ground of the negligence, unskilfulness or want of due care of the master or mariners, it is incumbent on him to show it; the *assured* not being bound to prove a negative.

How far the acts or omissions of the master and mariners should injuriously affect the rights under a policy of insurance of a *freighter of goods*, as distinguished from the *owner of the vessel*, *quere*.

ERROR from the Supreme Court. Bryan and Maitland brought an action in the superior court of the city of New-York against the American Insurance Company, on a policy insuring goods and merchandize to the amount of $21,000, to be transported from the city of *New-York* to *New-Orleans* by the ship *Kentucky*, and at and from thence by steamboat or boats to *Tuscumbia* in the state of Alabama; beginning the adventure upon the goods and merchandize from and immediately following the loading thereof on board the ship at New-York, and continuing the same until the goods should be *safely landed at Tuscumbia*. The perils insured against were : *of the seas, pirates, rovers, thieves, barratry of the masters and mariners, &c.* The goods were put up in boxes, &c., and arrived in safety at *New-Orleans*, where they were put on board of three steamboats to be transported thence to *Tuscumbia*.

1841.

Am. Ins. Co.
v.
Bryan and
Maitland.

On the arrival of the goods at the latter place, it was discovered that some of the boxes had been broken open and again closed, and it was found that goods to the value of $1,176.50 were missing. The declaration contained various counts, some charging the goods to have been taken and carried away *with force and arms* from the ship and from the steamboats by *persons unknown*, and others charging the masters and mariners of the ship and steamboats with *barratry*. There was no proof as to the manner in which, the persons by whom, or the time when, the missing goods were taken. On the proofs being closed, the counsel for the defendants insisted that the plaintiffs were not entitled to recover, it not having been shewn that the goods had been taken by *assailing thieves*, and that according to the established construction of policies of insurance the word *thieves* in the present policy should be deemed to apply only to *assailing thieves*, and not to a *felonious taking* by the *crew*. Chief Justice *Jones* charged the jury that a loss by *theft*, whether by assailing thieves or by the embezzlement of the crew, or by whatever persons, was a loss within the policy; and that if they should be satisfied that the alleged depredation had taken place, and had been perpetrated upon the goods under the protection of the policy, on board the ship or the steamboats, the plaintiffs, having counted upon a loss by theft and upon a loss by barratry, would be entitled to their verdict. To which charge the counsel for the defendants excepted. The jury found for the plaintiffs, and judgment was rendered upon the verdict. The defendants sued out a writ of error, removing the record into the supreme court, where the case was argued by:

*S. Stevens*, for the plaintiffs in error, and by

*B. D. Silliman*, for the defendants in error.

Mr. *Stevens* insisted that the charge to the jury was erroneous. He contended: I. That the risk against *thieves*

does not extend to simple theft by persons on board the ship, unaccompanied by force or violence; and that the word thieves in the policy means thieves assailing from without, and not thieves among the crew; and in support of this proposition cited 1 *Marsh on Ins.* 243. 1 *Phillips on Ins.* 258, 1st ed. 3 *Kent's Comm.* 303, 3d ed. 1st *Beawes Lex Mer.* 434–5. A marine policy, he said, is purely and exclusively a commercial instrument, and the signification or meaning of the terms used in it is determined by commercial usage, and not by their literal or common law sense.

II. But if the risk against *thieves* does extend to simple theft by persons on board the vessel, whether crew or passengers, still a loss occasioned by such theft is not a loss for which the underwriters are liable, if it could have been prevented by the proper care and vigilance of the captain: the instruction to the jury therefore, should have been with that qualification.

The underwriters are not liable for any loss, though embraced within the express risks insured against, if it be occasioned by the negligence, unskilfulness, or want of due care of the master or mariners, unless the policy expressly insures against losses which may happen from such negligence, unskilfulness, or want of due care. 1 *Phillips on Ins.* 224 *to* 226, 239. *Cleveland* v. *Union Ins. Co.*, 8 *Mass.* 321–2. *Grim* v. *Phœnix Ins. Co.*, 13 *Johns. R.* 451. *Millar's Elements of Ins.* 141–4.

The insurance against barratry is not an insurance against the negligence, want of skill, or due care of the master or mariners. Barratry is a criminal, or at least intentionally fraudulent misconduct of the master or mariners towards the owner of the vessel. 1 *Phillips on Ins.* 230–1, 233–5. *Phyn* v. *Roy. Ex. Ass. Co.*, 7 *Term Rep.* 505. 13 *Johns. R.* 457. *Millar on Ins.* 183–5. 2 *Johns. Ch. R.* 187–8, *per Kent, J.*

III. The insurance against barratry does not necessarily cover the loss in question: because, 1st. If the theft was

**1841.**

**Am. Ins. Co.**
**v.**
**Bryan and**
**Maitland.**

committed by a passenger, or any other persons than the crew, it is not barratry. 2d. If committed by the crew, it is not a barratry for which the underwriters are liable, unless it could not have been prevented by the due care and vigilance of the captain. 1 *Phillips on Ins.* 239. 13 *Johns. R.* 457–460. Theft by the crew, or other persons on shipboard, is presumed to be chargeable to the negligence of the master, and therefore it must not only be shown to have been committed by the mariners, but also to have been committed under circumstances that could not have been guarded against or prevented by due care and vigilance on the part of the master to constitute it barratry, for which the underwriters are liable.

By the charge of the judge, the jury were instructed, not only that the insurance against loss by thieves extended to simple theft by the mariners or passengers on board the vessel, but the question whether this theft could not have been prevented by the most ordinary care of the master, was entirely excluded from their consideration. Indeed, it was in effect instructing the jury that the underwriters were liable for the loss, notwithstanding it might have been occasioned by the mere negligence of the masters of the vessels. They are told in so many words, that to charge the underwriters, it is only necessary to find that the loss occurred while the goods were on board of the vessels.

Mr. *Silliman* insisted that the assured are protected against loss by either of the two provisions in the policy, against loss by *thieves* or by *barratry.* Here, he said, is an explicit contract between competent parties, and there is nothing in the subject of insurance to prevent as large or as narrow a contract as the parties may please to enter into; and the assurance may be against as few or as many perils as they see fit. 3 *Kent's Comm.* 291, 298. Policies are to be construed according to the common principles of construing all contracts—according to the known

and usual meaning of the words used—and are to receive a liberal construction for the benefit of trade, and a more rigid construction against the underwriters whose words they are. *Pelly* v. *Roy. Ex. Ass. Co.*, 1 *Burrow* 341. *Bond* v. *Nutt, Cowper* 601. *Robertson* v. *French*, 4 *East.* 130; 4 *Esp.* 246. *Coit* v. *Com. Ins. Co.*, 7 *Johns. Rep.* 385, and cases there cited. In this case we do not ask a liberal construction in our favor, but merely that the rule may not be reversed by an unusual liberality of construction in favor of the underwriters.

I. Barratry means any fraudulent act of master or mariners, whereby the owner or freighter is injured. *Valejo* v. *Wheeler, Cowp.* 143. *Brehen* v, *Combe*, 2 *M. & S.* 172. *Hallet* v. *Col. Ins. Co.*, 8 *Johns. R.* 272. *Cook* v. *Com. Ins. Co.*, 11 *Johns. R.* 40. 1 *Phillips on Ins.* 230, 238, 244.

II. The word *thieves* has the same meaning in the policy as in all other cases, and there is not a word in the English language which has, and has had for centuries, a more defined, limited and restricted meaning, both in common use and among lexicographers. Walker defines *thievish*—" secret, sly, acting by stealth; the robbery may be by stealth, yet thievery is by common understanding intended to mean secret, private larceny." But the counsel for the plaintiffs in error, contends that the word *thieves* in the policy is restricted in its meaning to *assailing* thieves, and cites Marshall, Phillips and Kent, elementary writers entitled to the greatest respect; but their *dicta* on this point cannot prevail against the express contract between the parties, unless those *dicta* are sustained by controlling authorities and decisions. Such, however, is not the case; they cite no decisions, but merely the remarks of some of the early writers on the civil law, which are totally inapplicable to the present case. The whole system of insurance at the present day, is different from what it was among the ancient continental cities, where it was regulated by codes and ordinances. It was then fettered, and the

liability of insurers restricted; an opposite rule now prevails, especially in England and the United States.

Moreover, the civil law writers never said, as the elementary writers alluded to have done, that the word "thieves," in a policy, did not relate to private larceny. The ancient policies contained no assurance against loss by thieves, and the only question debated by the civilians, was whether loss by secret theft was protected by the clause in these policies assuring against "*all fortuitous occurrences;*" and all their discussions as to *furtum* and *latrocinium* related merely to that point. Even this question they discussed only with reference to a case where the owner of the goods was at the same time owner of the vessel, and not to cases like the present, where the shipper is a third person and has no ownership in, or control over the vessel. The earliest policies of which we have any record, have no reference to loss by thieves. Magens gives a great variety of forms used in Florence, A. D. 1523; Antwerp, A. D. 1563; Cadiz, A. D. 1618; Hamburgh, A. D. 1731; Amsterdam, A. D. 1744; Leghorn, A. D. 1750; Copenhagen, A. D. 1746; Stockholm, A. D. 1750, &c., &c., and none of them assure against loss by thieves, but after naming certain general perils, assure against *all fortuitous occurrences.* There are but two exceptions from 1523 down to 1755, (viz: one at Hamburgh in 1731, and another at Amsterdam in 1744, being on land and inland transportation, and on diamonds sent by mail coach,) insuring against theft. Emerigon also gives (A. D. 1783,) a variety of forms, but they contain no such assurance. These early policies shew, (as well as the reasoning of the civilians,) that they wrote concerning cases in which theft was not insured against; and the commentators have overlooked this very material distinction when they say that the word *thieves in a policy* does not refer to *furtum*, but to *latrocinium.* Park, however, (*p.* 30,) and Hughes, (*p.* 232,) refer to the *dicta* of the civilians, and say that the law of England is silent on the subject, and

both admit that the express clause against thieves in the English policies places them on a different footing from the ancient policies.

Besides the civilians, Malyne and Magens are both cited as authorities for these *dicta* of the modern commentators, but their opinions on points of law are not entitled to any particular weight. Both were merchants and they give mainly abstracts of the codes and regulations of the continental cities and states. Malyne wrote in 1622. His book, *de omnibus rebus*, comprises, besides insurance law, a dissertation on book-keeping, on weights and measures, on manufactures, on colors, and on the best mode of managing bees. His opinions on a question of legal construction, are not, perhaps, the highest authority as a guide for the supreme court of the state of New-York. Moreover, the insurance against *thieves* was long subsequent to his work. The present form of policies insuring against " pirates, rovers, *thieves*," was adopted by the London Assurance Company in 1755. (*Magens.*) Magens was from Hamburgh, and his work, published in London, relates mainly to continental law, the ordinances of the states and great commercial cities of Europe—Barcelona, Bilboa, Florence, Genoa,Antwerp, Rotterdam, Copenhagen, Stockholm and Koningsberg, as well as the codes of Spain, France and Portugal.

These writers, and the commentators by whom they are cited, all refer to the civilians for their authority on this point. Emerigon, *Vol.* 1, *p.* 533, *sec.* 29, says that theft, accompanied by violence, (*latrocinium*,) is a " fortuitous occurrence;" but that simple theft, (*furtum*,) is not. He cites Cujacius, (who wrote prior to 1590,) who says, *furtum non est casus fortuitus;* Godefroy, who wrote prior to 1652, and Santerna and Straccha, who wrote in the latter part of the sixteenth century, and Roccus, whose work was published A. D. 1655. Now, none of these writers say that the assured are not protected by the word *thieves* in a policy, but that they are not protected where such in-

surance is not made, because theft is not a *casus fortui-tus.* Indeed, these very writers, and others on the civil law, *except* from their conclusions a case, such as ours, of a third person who ships goods on board; for as to such third person theft and barratry are each a *casus fortuitus.* *Le Guidon,* p. 319, c. 14. *Cleizac, A. D.* 1671, p. 319. The code of Louis XIVth, (*Des Assurances, sec.* 28,) provides that the underwriters " shall not be liable for barratry, *unless by the contract* they be engaged for the misdemeanors of master and mariners:" thus showing, that as to third persons their reasoning did not apply, and that even as to the owner of the ship, who might also be owner of the goods, their rule would not apply if an *express agreement* was made to indemnify him.

III. The rules regulating policies on the continent of Europe are inapplicable to English and American policies, which are ampler, and insure against a greater variety of perils. Barratry for instance, is insured against in no Mediterranean city except Marseilles, and there only on French vessels with French papers. None of the policies on the continent at this day assure against loss by thieves. The policies of Alexandria, Genoa, Naples, Leghorn, Marseilles, Amsterdam, Antwerp, Bordeaux, Cadiz, Hamburgh, Havre, Lisbon, Nantes, Paris, Rotterdam, Rouen, Stockholm, Trieste, &c. make no such assurance. (See forms of these policies in *Vaucher's Guide to Marine Insurance,* *London,* 1836.) All the British policies, including Bombay, Calcutta, Madras, Mauritius, and Jamaica, contain the assurance against *barratry* and *thieves;* the United States policies generally do the same.

Barratry was not protected by the ancient policies, and Lord Mansfield said it was monstrous that underwriters should insure against it, 1 *Term. Rep.* 323, yet they see fit so to do, and the argument would be as strong for not holding them in that case, as upon loss by *thieves,* which was also unprovided for in the old policies. Loss by *assailing* thieves (latrocinium) was covered as a *casus*

*fortuitus,* by the ancient policies; then why is the insurance against *thieves* now inserted but to protect against, what those policies did not protect, secret theft, (*furtum.*)

IV. The forms of policies are not only not alike in different countries, but they are constantly changing in the same countries. The memorandum clause was inserted in 1749, 3 *Burrows,* 1550. The provision "lost or not lost" is of comparatively recent date. "Unless the ship be stranded"—after the decision in *Cantillon* v. *London Ass. Co.* 7 *Term.* 222, that company omitted these words— many underwriters now insert and others omit it.

V. There seems then no ground for saying that the law limits the meaning of the word *thieves* to *assailing* thieves —that it changes the meaning of *furtum* into *latrocinium.* No usage is shewn, establishing this distinction. On the contrary, the word when used in a policy is held by underwriters themselves to have its natural and usual meaning. This is evident from the fact, that many companies limit their liability by excepting loss by thieves, or by assuring in express terms against "*assailing* thieves." The Georgia Insurance and Trust Company insures against "seas, rivers and fire, and all other perils *excepting* losses, &c. arising from or caused by *theft,* barratry," &c. The Baltimore Insurance Company, and the American Insurance Company of Baltimore, assure against "seas, enemies, pirates, *assailing* thieves," &c. All the Boston companies assure against "*assailing* thieves." The Jefferson Insurance Company of New-York formerly had this clause in their policy, "excepting perils, losses, &c. by *theft,* barratry," &c. They now insure against "*assailing* thieves," as do also the Howard Insurance Company of New-York.

VI. Theft is a peril to which the shipper is particularly exposed in the compounded transportation by sea and inland navigation in this country, and by all packet lines which now carry on the great business of taking goods on

1841.

Am. Ins. Co.
v.
Bryan and
Maitland.

freight. It is as much the interest and duty of underwriters to acquaint themselves with the character of the various lines as with the quality and age of a ship when insuring the vessel only.

VII. The construction of the word *thieves* now claimed by the counsel for the plaintiffs in error, was virtually denied in the case of *Storrow* v. *Atlantic Ins. Co.* 5 *Paige's R.* 285.

The supreme court *affirmed* the judgment rendered in the court below. See the opinion delivered by Mr. *Justice* COWEN, 1 *Hill*, 25, *et seq.* The insurance company thereupon removed the record into this court, where the cause was again argued by the counsel who had argued it in the supreme court. Mr. *Stevens*, the counsel for the insurance company, presented some views connected with the case not presented on the argument in the supreme court, adverted to in the opinion of Senator Verplanck *post*, to which the reader is referred.

After advisement, the following opinions were delivered:

*By the* CHANCELLOR. The policy in this case contains the usual clause inserted in most of the American and English policies insuring against *thieves* and against the *barratry* of the master and mariners. The evidence left it a matter of doubt, whether the goods were embezzled by some of the mariners employed about the ship, or steamboats, or by other thieves. The declaration contains several counts, some charging the loss to have been occasioned by *barratry*, and others charging it to have been by *thieves*. The case, therefore, presents two questions for our consideration: *First*—whether the word *thieves*, in this policy, covers a loss occasioned by a simple larceny, unaccompanied by open force or violence by persons other than the masters and crews of the ship or steamboats in which the goods were transported? and, *Secondly*—whether the insurance against *barratry*, covers a fraudulent or felonious

embezzlement or stealing of the goods by the master or crew?

I had occasion to express my opinion upon the first question several years since in the case of *The Atlantic Insurance Company* v. *Storrow & Boyd*, 5 *Paige's Rep.* 292. In that case, I arrived at the conclusion that the elementary writers, who held that the term *thieves* in the policy only meant *assailing thieves*, had followed the language of the continental writers on this subject, without adverting to the difference in the language of their policies from that which was contained in those of England and America. By referring to the marine ordinance of Louis the XIVth, promulgated in 1681, *Book* 3, *tit.* 6, *art.* 26, which enumerates the risks assumed by the underwriter, where there are no special stipulations on the subject in the policy, it will be seen that neither the word *thieves* nor *barratry* are used; and, so far as I have been able to discover, the only word used in any of the continental policies to cover any kind of theft, except what is included in the term barratry, is the French word *pillage*, or its equivalent. This term *pillage* imports latrocination, or robbery by force or violence; and not a simple larceny merely. *Merlin* defines it to be the plundering, ravaging, or carrying off of goods, commodities, or merchandize, by open force or violence. *Pillage c' est dégât, le ravage et l'enlèvement d' effets, de denrées ou de marchandizes, à force ouverte.* 23 *Merlin's Repert. de Juris. art. Pillage.*

The term *thieves*, in our policies, is not intended as a mere translation of the word *pillage*, used in the ordinance of Louis the XIVth, and in the present commercial codes of France and other continental powers. See *Code de Com. Francaise, book* 2, *tit.* 10, *art.* 350; *Lafond, D'Assur. Marit.* 101, *sur la Police D'Anvers; and Code de Com. D'Espagne, by Foucher, p.* 292, *art.* 861. By a reference to the continental policies as collected by *Lafond,* and to those of England and the United States, it will be seen that the language of the continental policies is in a great

many other respects entirely dissimilar from the language of English and American policies. In the absence of any judicial decision to the contrary, therefore, the most that can be inferred from the elementary writers on the subject is that the term *pillage*, in the continental policies, does not include simple larceny; and that the term *thieves*, in our policies, does not include theft perpetrated by the master or mariners, so that losses by larcenies of this last description must fall upon the assured, where there is no insurance against *barratry* by the master and the crew. *Marshall*, who wrote in 1802, appears to consider it as settled that the word *thieves* in a policy, only means assailing thieves, or those who assail or rob the ship by violence from without; but to show that this was not considered, even in England, as the settled construction of the word *thieves* in a policy, at that time, it is only necessary to refer to the work of Mr. Justice *Park*, the fifth edition of which was published under his own inspection in the same year that Marshall wrote. After referring to what is said by *Malyne* and by *Roccus* on this subject, especially by the latter, he adds, " It was thought proper thus to state the opinion of this learned writer upon the subject, the law of England in this respect being silent, though his reasoning upon this subject is by no means conclusive as to English insurances, on account of the express terms of the contract." *Park on Ins.* 25. And Mr. *Hughes*, who wrote twenty-six years afterwards, does not consider the question as settled, that the word *thieves* may not include losses by theft committed by persons on ship board as passengers, where the loss occurs without the fault of the assured. *Hughes on Ins.* 232.

Upon the second question there appears to be very little room to doubt that an insurance against *barratry* by the masters and mariners includes larcenies and embezzlements, of the goods insured, either by the master or the crew, other than mere petty thefts. By the ancient law of France, according to *Valin*, the insurer was answerable

for the barratry of the master and crew without any express provision in the policy to that effect; but not until the owner of the goods insured had exhausted his remedy against the master, for the loss sustained. *See Valin's Comm. upon the Ordin. of Louis the XIVth, by Becave, vol. 2, p.* 303. The ordinance, however, declared the insurer not liable for barratry of the master and mariners, where he was not by the terms of the policy charged with a loss by barratry. The same provision is contained in the commercial code of Napoleon, and in the commercial code of Spain, promulgated by Ferdinand VIIth, in 1829. But where, by the terms of the policy, the insurers take upon themselves the risk of barratry by the master and mariners, known to the continental lawyers by the terms *barratry of the patron,* they are answerable absolutely for any damage resulting from the acts of the master or crew, either by reason of ignorance, rashness, malice, change of route, larceny or otherwise; and such is also the law of Holland, according to Valin. *See 2 Becave's Valin,* 303. The meaning of the term barratry in British and American policies is not quite as extensive; but it unquestionably includes every act of the master or mariners of a criminal or fraudulent nature, tending to their own benefit and to the prejudice of the owners or charterers of the vessel. In the language of Mr. Justice Aston, in *Vallejo v. Wheeler, Cowp. Rep.* 156, it includes every species of fraud, knavery or criminal conduct in the master, by which the owners or freighters are injured; and it is equally extensive in its meaning when applied to the conduct of the mariners, except that it may not include petty thefts. 1 *Phil. on Ins.* 239. I have no doubt, therefore, that the stealing or embezzlement of the property in controversy, in this case, if perpetrated by the master or mariners of the ship, or of any of the steamboats upon which the goods were transported, was an act of barratry, covered by the policy.

For these reasons, I think the charge of the judge who tried the cause was not erroneous; and that the judgment

of the supreme court sustaining the decision of the superior court of the city of New-York should be affirmed.

By *Senator* VERPLANCK. The liability of the underwriters in this case must have been contested on wider grounds in the argument before us, than it had been in the courts below, since the opinion of Judge *Cowen*, written with his usual learning and research, does not cover all the points discussed before us.

The insurance was upon a number of packages of dry goods, sent from New-York to New-Orleans by ship and thence to Tuscumbia by steamboats. The policy was in the usual form, against " perils of the seas, men of war, fires, enemies, pirates, rovers, *thieves*, jettisons, &c., *barratry of the master and mariners*, and all other perils," &c. Some of the boxes were opened, and goods to a large amount taken out, before the arrival of the cargo at Tuscumbia. There was some evidence tending to show that the boxes were in good order, when put on board the steamboats at New-Orleans; yet it was not proved whether the depredation was committed on ship board or in the steamboats, or elsewhere, whilst covered by the policy; whether it was committed by the mariners, by the hands of the steamboats, by passengers or other persons, except that there was no attempt to prove that it was effected by open violence or robbery. Chief Justice *Jones* charged the jury that a loss by theft, whether by assailing thieves, or by the embezzlement of the crew, or by whatever persons, was a loss within the policy, and that, if the jury should be satisfied from the evidence that the depredation had taken place, and had been perpetrated upon the goods whilst under the protection of the policy on board the ship or the steamboats, the plaintiffs having counted upon a loss by theft, and upon a loss by barratry, would be entitled to their verdict. The counsel for the underwriters excepted to this opinion and charge, under which, a verdict was found for the plaintiffs below.

In support of this general exception, it is now contended: 1st. That insurance against loss by the barratry of the master or mariners, does not cover the thefts and pilferings by the latter, of goods on freight; or, 2d. That if it does so, it is only when such depredations could not have been prevented by due care and vigilance on the part of the master. 3d. That the insurance against *thieves* does not cover loss by theft unaccompanied by force, and that the word, in its technical sense in a policy, means only *assailing thieves;* but, 4th. That, allowing the more ordinary use of the word to apply here, the policy does not reach theft, occasioned or permitted by the masters' want of vigilance. If any one of these positions be correct, it is inferred that the jury were mis-directed by being instructed, that whether the loss took place on ship-board or in the steamboats, and whether the theft was committed by the crew or other persons, it was immaterial, as the loss would be covered, as caused either by barratry or by theft, whilst their attention was never directed at all to the inquiry of culpable negligence, or of due diligence in the care of the property.

The first two grounds of defence seem not to have been much insisted upon in the supreme court. But the charge unquestionably misled the jury in a point essential to the verdict, if, under the clause against barratry by the crew, the insurers are not answerable for their thefts, or if, in order to establish such a liability, it is necessary first to prove that there had been no want of due care by the master. The objection is by no means frivolous, or without foundation in reason and authority. Questions upon *barratry* of the crew, seldom come before the courts, except in cases of revolt, violence, compulsory deviation, &c. But the meaning of the word barratry, in its English use, is well settled by judicial authority and common usage; although it was not until Mansfield's series of judicial decisions on the law of insurance, that the present restricted and definite use of the word was fixed, and distinguished from the broader meaning given to it on the continent of Europe,

*Margin note:*

**1841.**

Am. Ins. Co.
*v.*
Bryan and
Maitland.

where it includes imprudence and unskilfulness as well as guilt. In 1774, Lord *Mansfield*, in *Vallejo* v. *Wheeler*, *Cowper R.* 154, remarked upon the wide difference between the English and the foreign sense of the word, and observed that " the notion of barratry had not yet been judicially considered, or defined with accuracy in England." He then defined it, in conformity with its derivation, and its use among the London underwriters, as comprising " whatever is a cheat, a fraud, a cozening, a trick by the master." Judge *Aston* defined it as " comprehending every species of fraud, knavery, or criminal conduct, by which the owner or freighter is injured." " Barratry," said Lord *Ellenborough*, " in the master, includes every species of fraud in the relation of the master to his owner, by which the subject matter insured might be endangered." *Earle* v. *Rowcroft*, 8 *East*. 126. In the Swedish policies, Judge *Aston* informs us, the phrase is rendered, " knavery of the master or mariners," and this translation is a good definition. Chancellor Kent sums up the definitions of our courts by saying: " It means fraudulent conduct of the master in his character of master, or of the mariners. It includes even breach of trust, committed with dishonest views." I cite these definitions, very familiar in reference to the master, both to show the inapplicability of the *dicta* and reasoning of the continental writers, who argue from a broader sense of the word, and also because there are very few English or American decisions touching the barratry of mariners, and those happen to be cases of open violence. We must therefore draw our conclusion from principles and general definitions, and the analogy of other decisions.

The definitions of the crime have been given judicially, in relation to *masters*, but they extend, both in words and the reason of the matter to the same offence by the *crew*. Accordingly, the " barratry of mariners," of our policies, must mean and include all fraud, knavery, breach of trust, or other criminal conduct of mariners, whereby the owner

or freighter suffers loss, or the subject insured is injured or destroyed. Embezzlement of property on board ship falls within such a definition. It has been thus held as to such embezzlement by the master, and so we find it considered by Lord Ellenborough, as to other common carriers and their servants. He said, as to goods lost by fraud in inland transportation, "barratry is large enough to include every species of fraud committed by carriers or their servants, taking them to stand in the place of master and mariners." *Boehm* v. *Combe*, 2 *Maule & Sel*. 172... Thus, theft and pilfering are evidently within the meaning and intent of the clause against barratry by the mariners, in the legal, as I presume it is also, in the ordinary commercial sense. If it were not so, it is very strange that some other clause to that effect has not come into occasional use, either in Great Britain or the United States, in some or other branch of trade peculiarly exposed to such hazards. It is true that the ship owner is answerable for such losses to the shipper of the goods, and that the crew, too, may be liable to contribute from their wages for the reparation of losses shewn to arise from their fraud or connivance. This is a good reason why, in the absence of any express stipulation, underwriters should not be presumed to be liable for such losses under their general contract of indemnity against all the fortuitous " perils that may come to the damage of goods," &c. And such was the understanding and reasoning of the elder English and the continental jurists. But the express object of an insurance against barratry, is to exempt the assured from the risk of the ship owner's solvency, and especially from the difficulties of proof of the loss having arisen in a given manner, and to comprehend all the probable causes of loss in the several terms of the policy, leaving it to the underwriter to follow out and assert the rights which he acquires by substitution to his assured, upon payment of the loss. But it is laid down in some of the books, (as in 1 *Phillips on Ins*. 238, 1*st ed*.,) that " the control and superintendence which

1841.

Am. Ins. Co.
*v.*
Bryan and
Maitland.

the assured has of the conduct of sailors, and is supposed to exercise through the captain, and the little trust which is ordinarily reposed in them, render the assured answerable for their conduct in a much greater degree than he is for that of the captain; and accordingly the insurers are, in proportion, less answerable for any breach of trust on their part, since it is the fault of the assured to repose any very great trust in them. With this distinction, an act of barratry in the mariners, does not differ from the same act in the captain; and therefore, where an act barratrous in its nature is done by the mariners, the insurers are answerable for a loss occasioned by it, if with due precaution and diligence it could not have been prevented. In regard to petty thefts and embezzlements, the insurers are in general held not to be answerable for them, since with due vigilance they might be prevented." This view of the law is sustained by the language of other elementary writers, and the analogy of various decisions, as *Pipon* v. *Cope,* 1 *Camp. R.* 434, and others cited on the points of counsel. I think, that in fact, this presents the ordinary practical result of the duties and liabilities of owners, masters and mariners, but overlooks their relative and successive rights and responsibilities in the manner they would affect a case like the present. I cannot, however, but remark, that the reason assigned for the restricted liability of underwriters, in the presumed control exercised over the crew through the master, is, so far as respects the owner of goods alone, purely theoretical and contrary to the ordinary fact; since, in reality, the master is no more under the control and within the knowledge of the shipping owner of goods, than of the insurers—often much less so. The distinction between the *ship owner* and the *shipper of goods,* in relation to the degree in which the acts of the master and mariners should justly affect their policies, was strongly put by the counsel. I find that it has been noticed by Sir William Scott and Chief Justice Gibbs, while there is strong authority against it. It is founded in reason, and seems to de-

mand more attention than it has yet received judicially, so as to mark definitely the degree in which the shipper's policy may be affected by the acts of those over whom he can have no control. But we are not now, in my opinion, called upon to define those boundaries, since the present case may be decided upon admitted principles.

The law of insurance, above every part of our jurisprudence, is formed by deductions of reason and justice from the nature, objects and terms of the contract. The interpretation of the contract, like every thing else relating to the meaning of words, must depend upon usage; but as soon as that meaning is settled, the law of insurance rarely fails to manifest the consistency and harmony of truth. I think that it will be found to do so here.

Barratry or criminal knavery of the mariners, including under that large term, embezzlement of goods freighted on board is a peril expressly insured against. When the loss occurs the underwriter is *prima facie* responsible. A loss of this kind stands upon the same footing with any other loss by a risk insured against, as for instance, the perils of the sea by rocks or tempests. The insurance in either case is an express contract to make good any unforeseen loss thence arising. But like losses by shipwreck, a loss by barratry of mariners must also be discharged if it arose immediately from the fault of the master, for his neglect short of barratry was not one of the risks undertaken specially, nor is it included as a peril of the sea. 3 *Kent's Comm.* 300. The insurers are discharged from loss by shipwreck caused by the ignorance or inattention of the captain; unless they specially insured against it. For the same reason the captain's culpable negligence as to the goods under his care may discharge the insurers from loss by barratry of the crew. But here, too, as in respect to loss by shipwreck, the defence of the master's misconduct is an excuse, a ground for exemption from liability, by shewing that the loss though appearing *prima facie* to have been caused by a peril insured against, was in fact

1841.

Am. Ins. Co.
v.
Bryan and
Maitland.

1841.

Am. Ins. Co.
*v.*
Bryan and
Maitland.

the immediate result of some other danger, not assumed in the policy, and like all similar defences against *prima facie* proof, it must be proved by those who are to be benefited by it.   It is a general principle of the common law, (with one or two specific exceptions on the ground of public policy,) that every man is to be presumed to do his duty until the contrary is established, and therefore the burthen is on the plaintiff to negative this presumption by appropriate proof.   *Williams* v. *East India Co.* 3 *East.* 192, where the reason and the learning of the rule are summed up with great succinctness and perspicuity.   Thus, the burthen of proof is here on the underwriter.   The assured is never required to prove affirmatively the fact of due diligence and care in order to make out his case, before any objection is raised.   Thus it has been held in the United States courts as to negligent navigation, deviation, unreasonable delay, that the proof is to be made out by those who are to be discharged by it from liability; the presumption is with the assured after proof of loss.   *Tidmarsh* v. *Washington Insurance*, 4 *Mason's R.* 441.   *Columbian Ins.* v. *Catlett*, 12 *Wheaton's R.* 383.   It had been thus held in the English courts as to barratry of the master.   In *Ross* v. *Hunter*, 4 *T. R.* 37, the court said that the question being whether the evidence for the plaintiff was sufficient to be left to the jury when the barratry of the captain was proved, " then the rule of evidence applies, that the affirmative is always to be proved by those whose interest it is to prove it."   Judge *Buller* said, " the plaintiff in such cases is to prove subscription to the policy, his interest, shipment in the vessel described, loss in consequence of such act as amounts to barratry;" but that " it was not incumbent on the plaintiff to prove a negative."   So more recently, on a defence by reason of an alleged violation of local law, it was held, that the burthen of proof was on the underwriter, " the presumption being that the party complied with the law."   4 *Camp. R.* 234.

In the present analogous case, the plaintiffs below were not bound to prove the care and vigilance of the master or others. Ordinary and sufficient vigilance is to be presumed till the contrary is shewn, in the same manner as competent navigation, due course of the voyage without deviation, or obedience to port and revenue laws. Indeed, this should be especially the rule in cases like this, since it is not the plain, naked fact of an omission by the master to restrain his crew that would discharge the underwriters. Such negligence might be collusive, or it might be an exceedingly gross breach of duty. In the first case, that would be confessedly barratry of the master, and so equally within the policy. In the latter, the result might be the same upon proof of gross and inexcusable neglect, according to the decision of the United States supreme court in the *Patapsco Ins. Co.* v. *Coulter*, 11 *Peters' R.* 225.

Again: in late years our courts have held, upon good reasons of policy and equity, that underwriters were not discharged from risks expressly assumed, because the losses were incurred remotely or consequently by default of the master or mariners. "It is a well established principle," said Judge Story, "that in *all* cases of loss we are to attribute it to the proximate, and not to any remote cause." 11 *Peters' R.* 225. It would then seem that the underwriters would not be discharged from their contract of indemnity against the thefts of mariners, unless by evidence of such an omission of duty on the master's part as did not amount to barratrous negligence, and was not a remote and accidental, but an immediate and proximate cause of loss. Such a degree of negligence may possibly occur, but it seems to require such precision of proof and is subject to such limitations and exceptions, that it cannot reasonably be presumed. Had there been any evidence of this nature, the judge should have instructed the jury on that point, but the assured were not called to make out an affirmative case of due vigilance.

1841.

Am. Ins. Co.
v.
Bryan and
Maitland.

But the evidence left it in doubt, whether the goods had been secretly plundered by some of the hands of the ship or steamboats, or by other thieves in the course of transhipment and transportation, and as it was charged that " a loss by theft, whether by *assailing thieves* or by the embezzlement of the crew, or by whatever persons, was a loss within the policy," the question, so learnedly investigated by Judge Cowen, is raised, whether insurance against " *thieves*, extends to thefts generally, or is confined to a peculiar and technical sense of losses by robbery or " assailing thieves from without," in the language of the books. If the word *thieves* were found in any informal written contract between two citizens about some other matter than insurance, or if it were now for the first time inserted in a policy by a New-York company, there would be little doubt, whether or no it were employed in any other than its ordinary signification. The only question likely then to arise would be, whether it should not be restricted to its popular sense of secret stealing, to the exclusion of robbery by assailing thieves. But there is old and high authority for a different sense of the phrase when used in a formal policy of marine insurance. The older English writers on commercial law, with some of the modern ones, and all the continental commentators, consider the underwriters not to be bound for loss by secret thieving. Chancellor Kent thus condenses these authorities: " The enumerated perils of the seas, *pirates, rovers, thieves,* include the wrongful and violent acts of individuals, whether in the open character of felons or in the character of a mob, or as a mutinous crew, or as plunderers of wrecked goods on shore. The theft that is insured against, by name, means that which is accompanied by violence, (*latrocinium,*) and not simply theft." 3 *Kent's Comm.* 303. In the last edition (1840) the distinguished commentator, thus remarks upon the decision of the very case now under review, then just made in the superior court, and upon a concurring decision of the present chancellor, *Atlantic In-*

*surance* v. *Storrow,* 5 *Paige's R.* 293, holding that the clause applied to persons who stole from the ship whilst she lay at a wharf. " This decision overrules all the old authorities and text books, for they all apply the term *furtum* or simple theft, as well as *latrocinium* or robbery, to assailants from without the ship, and exclude from the policy simple theft, as not being properly a casualty. All the English text writers follow the same rule as Malyne, Molloy, Beawes, Wesket, Miller and Marshall." He also cites to the same effect the great continental authorities of *Roccus, note* 42; *Emerigon,* 1 *ch.* 12, and *Boulay Paty,* the latest and best French author on insurance. To this imposing array of authority, I add that of *Phillips* in ⸱his treatise on insurance 1 *vol.* 258, first edition, though what he there says is a good deal qualified and modified in his recent edition of 1841.

In most other commercial contracts, mere book authority, (I do not speak of express decisions,) when opposed to the known and universal usage of language amongst those who are parties to the agreement, would, in my mind, be entitled to little weight. But it is otherwise as to a policy of marine assurance. That is an instrument which, having been formed gradually by commercial usage during two centuries and a half, retains much of its original form, with additions made from time to time as circumstances suggested them. Even in the most recent revisions of the policy by our New-York offices, the antiquated forms have been mainly retained, though new words have been added. Hence it is that Mansfield, Buller, Lawrence, Kenyon in England, and Marshall, Washington and other great judges with us, have spoken of the marine policy as " an obscure and strange instrument," " loosely drawn," or, according to Lord Mansfield, " conceived in an inaccurate form of words, but by length of time and variety of decisions, reduced to certainty." According to Lord Kenyon, if the underwriters of Lombard-street had not given a construction to marine policies, they would have been without legal effect;

"but the custom of merchants and underwriters had made them intelligible." 4 *T. R.* 238. These considerations make it important to inquire how far the authorities of the books are correct or applicable in modern use, and by limiting the meaning of the phrase regulate the contract itself.

There are no reported decisions on the point, except the two cases in our own courts above cited, one of which is now under review. But both express decision and general understanding have made the underwriters liable under this clause for *robbery with violence committed by persons from without ship*. This was decided as unquestionable by Lord Mansfield in *Harford* v. *Maynard* in 1783, reported by Park. It is received in all the books, and is, I believe, universally understood to be the law and the meaning of the contract. But is there sufficient reason for considering such robbery by assailing thieves, as the only peril assumed under the express agreement of the underwriters, to "bear and take upon themselves the adventures and perils of thieves," in addition to those of "enemies, pirates, rovers," &c. ? It is conceded as a first principle, acknowledged by the best authorities, that losses not in themselves fortuitous, but capable of being guarded against and prevented by due care and competent skill, are not within the general contract of assurance against "peril and losses;" and that, therefore, losses by larceny or secret theft, without violence, are not within the broad intent of the policy. But that general rule may be limited by express contract, and any special risk whatever assumed. This, then, is a mere question of the interpretation of the written contract. The clause appears not to be in use in the ordinary policies, ancient or modern, of France, Italy, Spain, Holland, or the north of Europe. See the policies used in the principal commercial cities of the world, as collected by *Vascher, Guide to Marine Insurance*. But it appears in the English policies, as it is now used here, from a very old date. It may probably be traced back to the reign of James I. Posthlewait's still valuable, though

1841.

Am. Ins. Co.
v.
Bryan and
Maitland.

antiquated, Dictionary of Commerce, (1751,) has preserved a report of two insurance cases decided in the king's bench in 1681, where this clause appears in the policies. It is found in the forms given by *Molloy* and *Malyne.* The editions (the third of both) which I have consulted are of 1686, but the latter writer appears to have first published in 1622. This throws us back to examine the older use and meaning of the words *thieves* and *theft.* They have had a peculiar use in our language. The primary meaning, which is now the ordinary one, is that of secret stealing or simple larceny. But they had formerly a more general signification, and comprehended robbery or violent taking, although that was never the exclusive sense. The signification was, either an unlawful and guilty taking of property generally, or else and more especially a secret taking. Our received translation of the Bible, that still fresh and living " well of English undefiled," was but little prior in date to the ascertained use of the clause in question, and it abounds in examples of these uses. The original words in the New Testament, κλεπτης and ληστης have respectively the precise sense of a " secret thief," and " a robber by force." They are translated indiscriminately by *thief,* though the former word is never translated "*robber.*" When the two words occur together, their distinct meanings are marked as " he is a thief and a robber." *John,* x, 1. But we read, " a certain man fell among *thieves,*" literally, " among robbers." Again, " ye have made my house a den of thieves," in modern language, " a robber's den," (*spelunca latronum* in the Vulgate.)

At a later date, we find Blackstone, a legitimate English classic, as well as the most pleasing and perspicuous of elementary teachers, explaining *larceny* by theft, and he speaks of it as either simple larceny or plain theft, unaccompanied by any atrocious circumstances, or else compound larceny, of which robbery is a species. It is needless to multiply examples, to show that at whatever period we may fix the introduction of this clause in our policies,

the words comprehended the largest risk of felonious taking with or without force, secretly or by open assault. Modern use has gradually restricted the sense to thieving unaccompanied by violence, but at no period do we find any usage of an exclusive signification of robbery only, which would not embrace the other meaning. Writers on the police of London, have described the systematic thieving from ships on the Thames, many years ago, and it was certainly to be expected that such losses should be occasionally anticipated and insured against in England. So, too, in the vast internal and coasting trade of our own country, where transhipments are so often necessary, and the precise facts of depredations so difficult to be traced, it is clear that such an insurance would often be wished, and the insertion of the word *thieves* was the most obvious mode to cover all such hazards. Another very strong presumption in favor of the more obvious and customary sense, as the one actually intended in our modern policies, is that many underwriters, who do not wish to assume that risk, have expressly excluded it by adding a restrictive word, so as to insure only against " assailing thieves," as it is found in many of the printed forms now used in Boston, Baltimore and elsewhere, and by one company in New-York.

In opposition to these strong reasons, is placed the authority of all the eminent continental writers, and of several of our most deservedly esteemed legal writers in England and America. The latter rest mainly on the opinions expressed by the former, there being no adjudicated case or judicial authority to be found in the English or American books. I have examined the passages in *Roccus*, cited to this effect, and agree with Judge Cowen, that his denial of the responsibility of underwriters for secret thefts, refers only to that undertaken under the general contract or form of policy of his own age and country; but that he does not regard the liability as not following special insurances against such a loss, or even as not incurred upon an insurance that the goods " should be conveyed *safely* " to their

destination.  I presume that all the French jurists, Emeri- **1841.**
gon, Pothier, Boulay Paty, refer, as Pothier certainly does,
to the French customary form of policy, which insures on-   Am. Ins. Co.
ly against " *pillage*," or plundering by violence, but not   Bryan and
against "*voleurs*," a word as comprehensive as our "*thieves*."   Maitland.
The French *Code de Commerce*, in its title *Des Assurances*,
also uses this word " *pillage* " as the exclusive risk of this
kind undertaken, and the observations of Boulay Paty and
his countrymen, on this point, since 1807, must refer
wholly to the provisions of the code.   Accordingly, I can-
not think that the *dicta* of these great jurists, with reference
to the codes or usage of their own country or times, when
transferred to the pages of our English text writers, should
overrule the primary and presumptive understanding of the
language of the printed contract.   I have said that most
of our text writers have adopted this opinion; but *Park*,
one of the most valuable of them, who has since acquired
a judicial authority, notices the silence of the English de-
cisions, and points out the distinction between the general
reasoning of *Roccus* and " the express terms of the English
policies."   *Hughes* and *Miller* both indicate the same
opinion.

Finally, an argument on this clause similar to that used
on the barratry clause, has been strongly pressed: that the
loss by theft is not one for which the insurers are liable, if
it be occasioned by the negligence or want of due care of
the captain.   The authorities here, are of the same charac-
ter with those already cited and examined in relation to
the barratry of the crew; and the conclusions to which
they come are to be taken with the same qualifications and
exceptions.   Loss by thieves is a peril expressly insured
against.   The insurance is made by the owner of the goods,
expressly because he does not wish to take the hazard of
making out his proof of loss in the way necessary to charge
the ship owner.   He therefore makes his policy broad
enough to cover all such depredations, and to make gene-
ral proof of loss sufficient for his indemnity, without prov-

1841.

Am. Ins. Co.
v.
Bryan and
Maitland.

ing precisely how and where it occurred. The master's vigilance is an implied condition of the contract, so far as this, that a loss immediately caused by it, is not within the intent of the policy. But due vigilance on his part is not to be proved by the claimant, in order to make out his right to indemnity. The burden of proof of negligence, not barratrous in itself, and yet actually causing the loss, is on the underwriter, as it is in respect to barratry of mariners. It falls within Lord Ellenborough's statement of the doctrine and practice of the courts. "The rule of law is, that when any act is required to be done on one part, so that the party neglecting it would be guilty of criminal neglect of duty in not having done it, the law presumes the affirmative, and throws the burden of proving the contrary, (that is, of proving the negative,) on the other side." *Williams* v. *East India Co.*, 3 *East.* 192. No such proof of the negative having been made out, or offered here, the judge was not called upon to direct the jury as to the legal effect of want of due vigilance by the master.

I think that the charge was correct throughout, and that the decisions of the courts below should be affirmed.

On the question being put, *Shall this judgment be reversed?* all the members of the court present at the argument of the cause, answered in the *negative*. Whereupon the judgment of the supreme court was AFFIRMED.