1835.

The Atlantic
Ins. Co.
v.
Storrow.

---

The Atlantic Insurance Company *vs.* Storrow & Boyd.

Under a policy of insurance upon goods, against loss by thieves, the underwriter is liable for a loss by thieves who are in no way connected with the ship, whether the robbery is perpetrated by a simple larceny or by open violence, although the master or ship owners may be also liable as common carriers for the loss.

Whether the insurer is liable for a loss from a simple larceny committed by persons belonging to the ship ? *Quære.*

Where the underwriter insures against loss by thieves, and the master or ship owners are also liable to the assured for the loss from a theft, such master or ship owners have no equitable claim upon the underwriter for a contribution to make good the loss. And if the assured receives satisfaction from them, the policy cannot legally be assigned for their benefit, so as to enable them to recover against the underwriter.

Where the master or ship owners are liable to the assured for a loss by theft, for which the underwriters are also liable, if there is an abandonment for a total loss, and the insurer pays the amount of such loss, he is entitled, in equity, to be subrogated to the rights of the assured, as against the master or ship owners. And if the assured cancels the bill of lading, or discharges the claim against the master or ship owners for the loss, after he has obtained judgment against the underwriter, the court of chancery will relieve the latter against the judgment, pro tanto.

1835.

The Atlantic
Ins. Co.
v.
Stor.ow.

May 25.

When two or more defendants bring a joint appeal, and fail as to the main object of such appeal, they will be charged with costs, although one of them succeeds in obtaining a modification of the decree in respect to his own interest merely.

THIS was an appeal from a decree of the vice chancellor of the first circuit. The facts of the case, as they appeared from the bill and answer, were as follows : In February, 1831, the complainants insured the defendant Storrow upon a box of specie, laden on board the Charles Carroll, from New-York to Havre ; for which specie a bill of lading in the usual form had been signed by the master of the vessel. A day or two after the underwriting of the policy, but after the commencement of the risk, the specie was stolen from the ship while she lay at the wharf in New-York, in the absence of the master and ship's crew, whereby Storrow claimed a total loss. On the 9th of March, 1831, he abandoned to the underwriters, who being advised that they were not liable for a loss accruing at the place of lading, declined paying the same. Storrow thereupon commenced a suit upon the policy, in the superior court of the city of New-York, in May term of the same year. In the progress of the suit, and before the trial, the complainants obtained an order from the superior court, against the plaintiff and his assignee, for a discovery on oath, of all receipts, instruments of assignment and of compromise relating to the specie insured, and to the claim of the plaintiff in that suit. Under that order the plaintiff and John I. Boyd, his assignee, produced the original bill of lading, and an absolute assignment from Storrow to Boyd, of the policy of insurance, and of sums of money, interest, benefit and advantage then due, or thereafter to arise. The assignment appeared to be for the sole benefit of Boyd, and was without date. Storrow and Boyd also accompanied these documents by their affidavit, sworn on the 14th of July, 1831, that these were all the papers relating to the insurance and the transfer of the plaintiff's interest therein. Shortly after this the complainants wrote to Storrow, that being unable, in the suit conducted in his name, to ascertain and establish the fact that he had transferred his right to the bill of lading and recourse against the ship owners, they should, in case of a recovery against the company in that

1835.

The Atlantic
Ins. Co.
v.
Storrow.

suit, expect to receive, on his abandonment, every necessary document to enable the company to enforce their remedy against the ship owners in his name ; and should hold him responsible therefor, if the company was made liable for the loss. To this letter Storrow answered, that upon being reimbursed the amount of specie shipped on board the Charles Carroll, he assigned to the owners all claims against the company ; in consequence of which assignment he had no longer any interest in the matter, nor had he any document which could aid in the suit which the company might bring against the ship owners. On the day after the receipt of this answer, the company again wrote to Storrow : " It is necessary that you should fully understand the situation in which we stand as to the specie by the Charles Carroll. If you have, either before or after the abandonment, received from the owners of the vessel the amount of the subject insured, we shall look to you, in case of our being subjected to pay a loss on the policy to you or your assignee, for full reimbursement. We have not as yet been able to procure proof of the owners' having paid the claim to you, and therefore are unable to protect ourselves from recovery on that ground, although we hope to do so upon others." After a recovery was had against the company in the suit prosecuted in the name of Storrow, the complainants wrote to him and the attorney in that suit, stating their readiness to pay the amount of such recovery, provided the bill of lading of the specie should be assigned to them, with suitable covenants that the remedy against the ship master or ship owners was not impaired ; and that unless that should be done, the complainants would be compelled to seek relief in this court ; and in that case would claim the costs to which they should necessarily be subjected. In reply, the attorney in the suit informed the complainants that the bill of lading had "long since been delivered up by Storrow to the master of the Charles Carroll, to be cancelled." And Storrow also referred the complainants to the attorney in the suit, for an answer. The complainants alleged, in their bill, that until the receipt of those answers, they were ignorant that the bill of lading had been cancelled, or otherwise discharged, but supposed it was still outstanding, and assigned to Boyd. By the an-

swer of the defendants, it appeared that the bill of lading was in the hands of Boyd, the assignee of the policy, at the commencement of the suit; and that the same was delivered up to the master of the ship and cancelled, after the judgment was rendered in that suit.

The vice chancellor decided that the underwriters were, by the loss and by the abandonment, entitled to be subrogated to the rights of the assured, if they paid the loss. And he made a decree that the complainants be allowed the amount which the master or ship owners would have been liable for, and that the judgment should only be enforced for the residue, if any thing. He also charged the defendants with the costs of the suit in this court. From the whole of this decree the defendants Boyd and Storrow entered a joint appeal.

*J. Anthon*, for the appellants. When the money in question was stolen from on board the Charles Carroll, the owner had a double remedy; against the underwriters, on the express undertaking in their policy, and against the ship owners, by the custom of the realm. The underwriters and ship owners were equally liable, and the one is not more the favorite of the law than the other; each being bound to indemnity. The underwriters might have protected themselves, by paying the loss, and taking, in addition to the abandonment of the specific articles, an assignment of the bill of lading. By so doing, the loss would have been fixed, without relief, on the ship owners, whose only chance for reimbursement would have been the *spes recuperandi* of the articles stolen. The ship owners, on the other hand, were equally entitled to protect themselves, by paying the loss, cancelling the bill of lading, and taking an assignment of the policy; in which case, after the judgment, and a payment by the underwriters, the sole chance of the latter for reimbursement would have been the *spes recuperandi* of the specific articles. The abandonment in the one case, and the title accruing to the ship owners by payment in the other, were similar titles to the specific articles merely; but such title could not, in the one case nor in the other, carry with it any contracts made in relation to the subject

matter. To give title to these, an actual assignment was necessary.

The rights of both parties being thus equal, the maxim of law *qui prior est tempore potior est jure* applies. All the priorities have been secured by the ship owners. They paid the loss promptly, and having thus acquired title to the specific articles, they took an assignment of the policy, for their protection. They abandoned to the underwriters the subject matter, and then sued them on the policy, and obtained judgment. The underwriters, on the other hand, have slumbered throughout. They would not accept the abandonment; they contested their liability in chief; and to the present day have not, by payment of the loss, put themselves in a situation to ask for equitable relief. *Vigilantibus non dormientibus leges subvenient.*

The complainants' bill is framed upon the supposition that the assured is about to receive, or has received, a double compensation, and that as to such additional sum, he is the trustee of the complainant. The facts in the case do not support this position. This is not a case in which the assured can have a double compensation, or seek one; but where his name is used pro forma merely, for the indemnity of those who have acquired legal rights by superior vigilance. If this was such a case, the complainants might have defended themselves on this ground on the trial at law, the state of the case being the same there as here; and having neglected to do so, the judgment is a conculsive bar, and cannot be opened in equity to let in such a defence. The vice chancellor, therefore, erred in ruling that the judgment was no bar, because, although the party defendants below knew the facts forming a defence, it did not appear that the evidence was produced or overruled, and also because this court had concurrent jurisdiction of the matter.

In every point of view this case is with the defendant. There is equality of rights; a priority of efforts in securing such rights; a legal title, and that pursued to final judgment at law. While the complainants, on the other hand, stand entirely naked; their contract being broken, and nothing

1835.

The Atlantic
Ins. Co.
v.
Storrow.

done by them in compliance with its provisions. If the complainants should succeed on the grounds set forth in their bill, it will follow that the clause in the policy against loss by theives is nugatory; inasmuch as there will always be a bill of lading with the legal responsibilities attached to it, and so the underwriters will earn the premium without incurring any risk.

If the vice chancellor was right in relieving the complainants from the loss arising from their own laches, he was wrong in awarding costs against the defendants. This would operate as a reward for supineness.

*D. Lord, jun.* for the respondents. By the abandonment, the assured became a trustee, for the insurer, of the *spes recuperandi*, and also of the collateral remedies for obtaining compensation for the loss. And the insurer is entitled to have the same transferred to him unimpaired, on payment of the loss. (*Phil. on Ins.* 464. *Hughes*, 432, 515, 381. 1 *Marshall on Ins.* 246. *Gracie* v. *N. Y. Ins. Co.*, 8 *John. Rep.* 245. *Randall* v. *Cochran*, 1 *Vesey*, 98. *Goodsall* v. *Boldero*, 9 *East*, 72. *Mason* v. *Sansbury*, 2 *Marshall*, 794. *Clark* v. *Inhabitants of Blythe*, 2 *Barn. & Cress.* 254.) Especially is the insurer on the cargo entitled to the remedies on the bill of lading, because the insurance presupposes the protection growing out of the carrier's responsibility.

The ship owners and the insurer do not stand with equal equities, entitled to bargain for priority with the assured. But on the contrary, the ship owners are under the prior contract and prior liability, and in no privity with the assured as to the policy of insurance; while the underwriters are privies of the assured, as to the bill of lading. The bill of lading does not suppose previous insurance, but the policy does presuppose the liability of the carrier. Payment of the insurance does not discharge the bill of lading, but a payment by the ship owners on the bill of lading discharges the insurance.

The right of the insurers to the remedies in the power of the assured is the same as that of a surety, to be substituted in the creditor's place, as to his remedies for the debt of the principal. See *Wright* v. *Mosely*, 11 *Vesey*, 22, and 2 *Vern.* 608,

as to surety's right to suit against bail. The assured is obliged to transfer the bill of lading to the insurer, but he is not obliged to transfer the policy to the ship owners; therefore these parties do not stand in equal equities as to the bill of lading and the policy. To allow the carriers or ship owners to protect themselves by recovering under the policy of insurance, is as contrary to the policy of the law as is an insurance of the master's wages, or against his negligence.

The depriving of the insurers of the remedy on the bill of lading was such a violation of the duty of the assured to the insurers as to subject the former, or his assignees, to account for the amount recoverable on the bill of lading, and to make it the duty of the court to restrain them from receiving the loss of which the assured had prevented the underwriters from obtaining reimbursement. (*Beardsley* v. *Root,* 11 *John. Rep.* 464. *Hayes* v. *Ward,* 4 *John. Ch. Cas.* 129.) The right of the insurers related back to the abandonment by the assured, and a transfer by him of the bill of lading, with the policy of insurance to the ship owners, or a trustee for their use, or a release to them, was a transfer or release, with full notice of the insurer's interest. It was therefore fraudulent as to the underwriters. (*Phil. on Ins.* 459.) It is the same thing as a creditor holding collateral securities, and assigning or releasing them after calling upon his debtor for payment.

The insurers are not deprived of their remedy by not setting up the cancelment of the bill of lading as a defence at law. The assured and his nominal assignees would not discover the fact at law, nor give the underwriters the means to prove it; but, on the contrary, the fact was studiously concealed in the proceedings upon the order of July, 1831. The assignment of the policy of insurance and bill of lading were made to the defendant J. Boyd, who was neither master nor owner. And the cancelment of the bill of lading was not disclosed till after the judgment; so that there was no defence which the underwriters could have made at law. As the policy and bill of lading were transfered together for one purpose, the transfer must be presumed such as to be consistent with a recovery at law. Therefore it is not to be presumed, and it was not in fact proved, that the bill of lading

was cancelled until after the judgment. The contrary in fact appears from the answer of the defendants. If the ship owner procures an assignment of the policy on goods to a trustee, and the trustee then cancels his bill of lading, and concealing the evidence of that fact from the underwriter, sues for a total loss, it is fraudulently claiming a double compensation as assignee of the policy. The claim of the insurers, upon the cancelment of the bill of lading, even if they could have proved the fact at law, was like a counter-claim, or set-off, capable of being pursued by the aid of equity for discovery and relief, as well as by defence at law. A debtor, who has lodged collateral securities for his debt, may suffer a recovery at the suit of his creditor, and then file his bill for relief and an account of wasted assets, as well as to set up that defence in the suit at law. In all cases of a mere technical total loss, when an abandonment is not accepted, the assured has in hand the remnants saved. And the underwriter is not bound to set up this in his defence, or be precluded of his right to an account for them. Suppose an abandonment of a ship while abroad, which afterwards arrives in safety, making a gaining voyage; the underwriter might pay the loss, or suffer a recovery against him for the same, without losing his right to the property, or the right of having an account for the proceeds thereof.

THE CHANCELLOR. The learned commentator on American law appears to suppose that the express provision against loss by thieves, contained in modern policies, does not embrace a loss by simple larceny, such as occurred in this case, but only that kind of theft which is accompanied by violence. (3 *Kent's Com.* 2d ed. 303.) So far as relates to losses by thieves, on shipboard, he is certainly sustained in this opinion by some of the ancient writers on the law of insurance. Malyne says, " If there be thieves on shipboard, among themselves, the master of the ship is to answer for that, and not the insurer; though the words of the policy assures against losses by thieves, yet they are to be intended assailing thieves. (*Maly. Lex. Merc.*, ch. 25, 4th ed., p. 295.) Weskett also refers to this passage from Malyne, and concurs in the opinion that the insurers are not liable for losses by thieves who are

on shipboard. And he adds, "When a theft has been committed during the night, by land robbers, while the vessel is in port, then it seems the insurer is not bound; such pilferers being different from pirates." (*Weskett on Ins., tit. Theft.*) It is evident, however, from what follows this remark, that he did not intend to apply it to a case where the policy contains an insurance in terms against a loss by thieves. So Roccus, concludes that the insurer is not liable for goods stolen on board the vessel; that is, by persons rightfully on shipboard. (*Roccus on Ins., n. 42.*) He says that where a theft is committed by robbers from the shore, while the ship is in port, it would seem that the insurers are not liable; for these robbers differ essentially from pirates. But he adds, "this, however, is only true when the insurance is against *shipwreck, enemies and pirates;* for those robbers not being mentioned, they cannot be considered as included in the insurance." (*Idem, n. 43.*) Emerigon also recognizes the distinction between a simple theft and one accompanied by violence from without; and he concludes, that the former does not belong to the class of casualties insured against, because the law presumes it might have been prevented by proper vigilance. (*Emerig. Trait Des Assur., Tom. 1, ch. 12, § 29.*) I think, however, from the authorities which he cites, that he only speaks in reference to the general contract against loss by sea risks, and without reference to the express clause, embraced in modern policies, against loss by thieves. The question is not presented here, whether the insurer is liable, under this clause in the policy, for loss from a simple theft by persons belonging to the ship. But he is clearly liable for a loss occasioned by the act of thieves who had no connection with the ship, although the master and ship owners may also be liable as common carriers, on their bill of lading. And it makes no difference in this respect whether the robbery was a simple larceny (*furtum*) or perpetrated by open violence, denominated *latrocinium* by the civil law.

It is insisted, however, on the part of the respondents, that, although they have succeeded in satisfying the superior court that this was a loss for which the underwriters were liable on this policy, it was a case in which the underwriters and

ship owners were equally liable, and that the equities of both were equal as to the assured. Even if this were so, it does not follow that the assured had a right to receive the amount of the loss from either, and assign over to the one from whom it was received the right to claim the full amount from the other party. It would rather present a case of equitable contribution, in which each should contribute a moiety towards the loss, as in the case of a double insurance. The insurers, however, are not liable to contribute for a loss, for which the master or ship owners are also liable to the assured. The contract of insurance is a mere contract of indemnity to the assured against such losses as he may actually sustain by reason of any of the perils assured against. And upon an abandonment and payment, or upon a recovery, as for a total loss, the underwriters are entitled to subrogation, at least in equity, to all the rights and remedies which the assured has to the property which is not actually destroyed, including the *spes recuperandi* from any other source ; unless the underwriters have relinquished that right by a stipulation in the policy. On this question, I fully concur with the vice chancellor in the conclusion at which he arrived, and also as to the reasons and weight of authority upon which his decision was based. If it had appeared upon the trial of the suit at law that the assured had received a compensation for his loss from the ship owners, or the master, and that the assignment was made for their benefit merely, to enable them to recover back the amount of the insurance from the underwriters on the policy, there can be no reasonable doubt that it would have been a good defence at law, at least to the amount thus received. And the result would have been the same, if it had appeared that Boyd, the assignee, had received such compensation after the assignment of the policy to him. The defence would have been equally available, if the underwriters could have shown that Storrow, or his assignee, had cancelled the bill of lading, or otherwise discharged his claim against the master and ship owners.

The particular manner in which the matter has been managed, probably with a view to defraud the underwriters of their remedy over against the ship owners or master, cannot,

in this court, vary the rights and equities of these parties. It was stated, in the letter of Storrow to the underwriters, in the latter part of July previous to the trial, that he assigned to the ship owners all claims against the company, upon being reimbursed by them the amount of the specie shipped on board the Charles Carroll. But before that time the complainants had been furnished with his affidavit, and a copy of the assignment; by which it appeared that he had assigned the policy absolutely to Boyd, and in his own right. The letter of the nominal plaintiff could not, therefore, have been used as evidence on the trial to defeat the rights acquired by the assignee, under the previous assignment. Neither could Storrow himself have been a witness to prove the facts stated in his letter; as he was the nominal plaintiff in the suit. Even if the facts stated in that letter were true, therefore, I do not see how the complainants could have availed themselves of them, as a defence on the trial at law.

Whether Boyd was in fact a bona fide assignee of the policy, or only took the assignment under a fraudulent arrangement entered into between the ship owners and Storrow, for the purpose of depriving the underwriters of their legal and equitable right of subrogation, does not appear from the pleadings in this suit. The complainants do not pretend to know how the fact really was; and the defendants are entirely silent on the subject. They simply admit the writing of the letters referred to in the bill; but without saying whether the information contained therein was true or otherwise. In the absence of all proof on this subject, I must therefore presume, from the assignment itself, notwithstanding what was stated in the letters, that there was a bona fide assignment to Boyd, who had a legal right to recover upon the policy, by being substituted in the place of the assignor. But by giving up the bill of lading to the master to be cancelled, after the judgment was obtained, the complainants were deprived of their remedy over against the ship owners; and standing merely in the character of sureties, to indemnify the assured against actual loss, the judgment must, in equity, be considered as satisfied *pro tanto*. The vice chancellor has therefore very properly directed that the amount which the master and ship

owners would have been liable for upon the bill of lading, should be deducted from the amount of the judgment; instead of decreeing a perpetual injunction against the collection of the whole debt and costs.

The conduct of Storrow in this matter has been such as to leave him without any claim to costs against the complainants. But as it does not appear, except from the statement in his own letter, which was not before the court as evidence upon the hearing upon bill and answer, that he was actually a party to a fraudulent arrangement with the ship owners to deprive the complainants of their rights, although such was probably the fact, I think the vice chancellor should not have charged him with the complainant's costs. The decree must therefore be modified in that respect. As to Boyd, he was fully apprised of the complainants' equitable rights, by what took place in the progress of the suit in the superior court; and having delivered up the bill of lading in fraud of those rights, he was properly charged with the costs necessarily incurred by the complainants in this court.

As both of the defendants have concurred in a joint appeal from the whole decree, and as they have substantially failed as to the whole, there is no good reason for excusing either from the payment of the costs of the appeal.