**HOOPER ET AL. vs. WHITNEY.**

APPEAL FROM THE COMMERCIAL COURT OF NEW ORLEANS.

The effect of a valid abandonment of the object or property insured, is to transfer it to the underwriters, who take the place of the insured.

The underwriters are subrogated to the rights of the insured by the abandonment, which also goes to include the *spes recuperandi.*

So a sale of a vessel at the port of necessity, by the master, under necessitous circumstances, vests the purchaser with a good title. The insured, after abandonment, cannot set up any claim, or maintain an action against the purchaser to recover her.

This is an action by the late owners of the ship Bombay, to recover her from the defendant, who is a third purchaser and owner, after she had been sold as a wreck, and abandoned by the plaintiffs', her owners, to the underwriters.

The facts of the case are so fully stated in the opinion of the court, that it is unnecessary to recapitulate them.

The cause, after an elaborate investigation, with a mass of testimony relating to the loss, abandonment, sale, purchase and repair of the vessel, &c., was submitted to a jury. There was a verdict and judgment for the defendant, and the plaintiffs appealed.

*Roselius,* for the plaintiffs and appellants.

*Grymes & Benjamin,* for the defendant.

*Garland, J.* delivered the opinion of the court.

The object of this suit is to recover from the defendant a ship called the Bombay, which the plaintiffs allege belongs to them, together with $10,000 damages. A writ of sequestration was asked for and obtained; the ship sequestered and released, upon giving bond as required by law.

The defendant, for answer, says this action cannot be maintained, because, if the plaintiffs ever had any right or title to the ship, which is not admitted, they have transferred and abandoned all their rights to certain insurance companies who had taken and held risks upon the vessel at the time of the loss,

and at the institution of this suit, no right existed in the plaintiffs.

For further answer, the defendant says, he is in possession of said ship by a legal and just title.   He avers that the Bombay, on or about the 5th of February, in the year 1838, departed from New Orleans on a voyage to the port of Boston, then belonging to persons unknown to him.   That she was wrecked near the Tortugas, but by the assistance of the wreckers on the coast, was got off the reef in a leaky and sinking condition, and afterwards abandoned by the captain, crew and sailors as being wholly worthless and unseaworthy, and incapable of being brought into any port where she could have been repaired.   That prior to being so abandoned, the vessel was stripped by the sailors of all her apparel, tackle and furniture, which was carried to Key West, libelled and sold, and the hull and masts left, without the master having any means of saving her, at a distance from any place where repairs could be made. The master being fearful that if he delayed, until he could hear from the plaintiffs, the hull would be lost, had it sold at public auction at Key West, where it was adjudicated to Tifts & Co. for $1450, who paid the money and received a blll of sale for the vessel.   That afterwards defendant, in behalf of himself and partners purchased the ship from Tifts & Co. for $12000 ; they having previous to the sale expended a large amount in repairs and refitting her and labor in raising and getting the water out of her.   That in the sale at auction, the master acted as the agent of all concerned ; that it was a case of extreme and eminent necessity that justified the sale, which was made in good faith and in the exercise of a sound discretion, under circumstances that warranted it, wherefore it is good and valid. He further says the sale has been ratified and approved by plaintiff.

It is further alleged, that in the event of the court being of opinion that the sale is not valid, then the defendant is entitled to $25,000 for salvage, repairs and other expenses in saving the ship and refitting her, for which he prays judgment and claims a lien.

Sometime after this answer, the plaintiffs filed a supplemental petition alleging fraud and collusion between the captain of the ship and Tifts & Co., the wreckers and purchasers. He says the captain was bribed by the wreckers to sell and sacrifice the ship, when there was no necessity for so doing. That the whole proceeding was illegal, fraudulent and collusive, and cannot divest petitioners of title, of all of which the defendant was well aware before he purchased. To this the defendant filed a general denial.

The evidence shows that the plaintiffs were the owners of the Bombay; they chartered her to the Messrs. Lombard, of Boston, to make one or more voyages from that port to New Orleans, and at the instance of the charterers, the owners appointed Micah Humphreys the master. The vessel was insured by the Atlas and Columbian Insurance Companies in Boston, for $35,000. She sailed from New Orleans on the 5th of February, 1838, and struck on the Loggerhead reef near Tortugas, on the night of the 10th, being at the time under full sail. A few minutes after the ship struck, a signal was made for assistance; several wrecking vessels being in sight, they immediately came on board, and told the captain in reply to his request for immediate help, they could give him no other assistance than to take out his cargo, and that the sea was too rough for them to come alongside then. The ship remained on the reef several days, when about a third of her cargo was taken out, she got off, and after much difficulty was taken into Tortugas harbor, where she was unloaded, the cargo taken to Key West; the ship stripped of her sails, rigging, tackle and furniture, leaving her hull with the masts and spars only at Tortugas, which is an island inhabited only by the keeper of the light-house and his family.

The news of the ship being wrecked was communicated by the master on the 17th of February, by a vessel bound to New York or Boston, and was published in the papers of the latter city on the 8th of March. On that day, the plaintiff, Robert Hooper, Jr., made an abandonment as for a total loss to the

EASTERN DIS.
July, 1841.

HOOPER ET AL.
vs.
WHITNEY.

Columbian Insurance Company, and on the next day John Hooper, Jr. made a similar abandonment to the Atlas Insurance Company. Before the expiration of the sixty days from the time of abandonment, the plaintiffs received $5000 on account of the policy from the Columbian office and on the 9th of May Robert Hooper addressed a second letter to the president of that company demanding payment of the balance due on account of the loss, referring to his previous abandonment. On the 10th of March captain Gifford was sent to Key West by the owners of the ship and cargo, to look after their interests, which place he reached on the 5th of April. From him information was received, upon which, on the 26th of April a power of attorney was sent to him by the plaintiffs and the insurance companies, by which they jointly and severally authorized Gifford to demand of any and all persons the custody of the Bombay, " and in our names as the lawful owners of said ship, to take the actual custody and possession of the same, her tackle, apparel and furniture," and against all persons who may refuse or resist him in taking such possession, " in our names to pursue or institute any libel, process, suit or claim in admiralty or at common law," and the same to prosecute " in our names and behalf." At the time of the execution of this procuration, a paper was signed by all the parties, stipulating that the rights the plaintiffs had against the insurance companies should not be prejudiced by the act.

Soon after the reception of this power this suit was instituted, and the defendant says it cannot be maintained, as the plaintiffs, by their abandonment and receipt of a part of the money due on the policy, have divested themselves of all right or title, and the same is vested in the insurance companies.

The effect of a valid abandonment of the object or property insured, is to transfer it to the underwriters, who take the place of the insured.

It is a well established principle, that the effect of a valid abandonment is to transfer the property in the object insured. The payment of a total loss by the insurers or their liability to pay such a loss in consequence of an abandonment, gives them a title to the property or what remains of it ; 2 Phillips on Insurance, 417 ; Ed. 1841 ; Marshall on Insurance, 600 ; 5 Mar-

tin, N. S. 371. The Supreme Court of the United States in a case in 4 Peters 139 and another in 6 Cranch 268, say, an abandonment if legal, puts the underwriters completely in the place of the assured, and the agent of the latter immediately becomes the agent of the former. The correctness of this doctrine is not denied by the counsel for the plaintiff, but he says an abandonment after it has been accepted, may be revoked or suspended if the parties agree to it. This is no doubt true, but the question arises how does the admission operate on this case? That the parties have not agreed to revoke the abandonment is clear, from the agreement entered into, when the power of attorney to Gifford was executed. The rights of the plaintiffs on the insurance companies were not to be affected by it. Has there been any suspension of the abandonment? It would not seem so, from the fact that one of the plaintiffs called on the underwriters for the whole amount of the loss within fifteen days after the power of attorney was executed. The underwriters are subrogated to the rights and interests of the insured; 5 Paige 285; and the abandonment goes so far, as to include the *spes recuperandi;* 2 Phillips Ins. 420. It is not easy to imagine a more complete investiture of rights and no formal deed of cession is necessary to pass them.

The counsel for the plaintiffs contends their abandonment is not legal, as the injury sustained by the ship was not of the value of one half of her after she was repaired. This argument might be a formidable one if the case were between the plaintiffs and underwriters, in behalf of the latter, but it cannot be properly urged against a third person, to deprive him of that which he appears to have purchased in good faith, at the same time it appears the plaintiffs are holding on to their claim for a total loss against the underwriters. But to waive any such objection, we are satisfied the injury or loss amounted to more than half the value of the vessel after she was repaired, deducting a third of new for old.

The evidence satisfies us, the ship could not have been thoroughly repaired at Key West, if the captain and wreckers

could have carried her there, when she was gotten off the reef. The most that could have been done, would have been to patch her up, so that she could reach another port. Very little more could have been effected at Key West than was done at Tortugas harbor, and the risk to the vessel of making repairs at the former place was greater than at the latter, from the fact of the harbor being more exposed. The vessel must necessarily have been brought to New Orleans or carried to a more distant port, the risk and trouble of which ought to be taken into consideration. Marcy & Bailey, who are ship carpenters, and had ample opportunities of examining the ship, say this would be worth at least $10,000, the repairs in New Orleans, according to Robertson's estimate, which includes cables and anchors and some expenses that are included in the above sum, amounted to about $8000, which makes the sum of $18000. The testimony as to the value of the vessel after she was repaired, shows she was not worth more than $28,000, then deduct the third, of new for old, which applies to the materials, and not the labor, from the $18,000, and more than half the value will remain ; if this calculation was to be made of the costs of repairs at the port of necessity (Tortugas) it would be more onerous on the plaintiffs, and increase the costs. As the cause is now presented to us we think there were sufficient grounds to authorize the abandonment for a total loss.

So a sale of a vessel at the port of necessity, by the master under necessitous circumstances, vests the purchaser with a good title. The insured, after abandonment, cannot set up any claim, or maintain an action against the purchaser to recover her.

The plaintiffs therefore stand before us divested by their own act of all rights to the vessel, and cannot recover it. We know of no law that authorises a party, who has parted with all his rights to property and subrogated another to them, that will authorize him to set up title and recover the thing in the hands of a third person, under the pretext that the benefit is to result to the subrogated party, without it being so alleged.

The judgment of the Commercial Court is therefore affirmed with costs, without prejudice to the rights of the underwriters.