Dorothy B. McCREA, a Widow, Individually, and as Independent Executrix of the Estate of Herbert R. McCrea, Dec'd, and James A. McCrea, a Minor, Plaintiffs-Appellants,

v.

HARRIS COUNTY HOUSTON SHIP CHANNEL NAVIGATION DISTRICT and Pacific Employers Insurance Co., Defendants-Appellees.

No. 27499.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1970.

Rehearing Denied and Rehearing En Banc Denied April 13, 1970.

Warner F. Brock, Brock & Williams, Houston, Tex., for appellants.

Finis E. Cowan, Houston, Tex., for appellees; Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel.

Before GEWIN, THORNBERRY and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

On August 18, 1964, Herbert R. McCrea, an employee of Harris County Houston Ship Channel Navigation District (Navigation District), was killed when he fell into a concrete-lined pit, housing an hydraulic dumping mechanism used by the Navigation District in unloading grain from railroad cars. Mrs. Dorothy McCrea,[1] his widow, filed suit in the United States District Court for the Southern District of Texas seeking damages from the Navigation District under the Federal Employers' Liability Act[2] Alternatively, Mrs. McCrea sought to recover the maximum compensation benefits allowed by Texas law from Pacific Employers Insurance Company, the Navigation District's compensation carrier.[3]

The principal question presented to the district court was whether the Navigation District which owns no locomotives[4] or cars, employs no typical railroad employees, operates no scheduled trains, and makes no direct charge for movement by rail is a "common carrier by railroad" as defined by FELA.[5] The ambiguous nature of the Navigation District's operations permits a substantial argument that it is a strange but statutory "railroad." The case was tried without a jury, and the court concluded that while the Navigation District was engaged in interstate commerce, it was not a "common carrier by railroad" and dismissed the FELA claim. Pursuant to an agreement by the parties,[6] judgment was entered against

---

1. Mrs. Dorothy McCrea prosecuted the suit individually and as executrix of her husband's estate. She was joined as plaintiff by James A. McCrea, a minor, and Jeannine McCrea Morris, both children of the decedent. On appeal their interests are identical and reference to Mrs. Dorothy McCrea as appellant, hereinafter, shall be deemed to include all of the above.

2. 45 U.S.C. § 51.

3. Appellant's right to recovery under the Texas workmen's compensation law has never been disputed and the parties stipulated that should the court deny appellant's claim under FELA, judgment should be entered against the compensation carrier for the maximum statutory death and funeral benefits.

4. The Navigation District does own and maintain a number of locomotive cranes which are leased to stevedoring companies for use at wharfside in loading and unloading vessels.

5. 45 U.S.C. § 51.

6. See note 3 supra.

Pacific Employers for the maximum compensation and funeral benefits allowed by state law. We affirm the district court's dismissal of the FELA claim.

On appeal Mrs. McCrea contends that the district court erred in: (1) dismissing appellant's claim under FELA. (2) Refusing to comply with appellant's request that it make separate findings of fact and conclusions of law. (3) Failing to include interest on the past due compensation installments in its judgment. (4) Failing to provide that the award would bear interest from the date of the entry of judgment.

I

The Navigation District is a creature of state law[7] and a political subdivision of the State of Texas operating terminal facilities at the Port of Houston. The direct link between the Navigation District and various rail carriers is a belt railroad operated by the Port Terminal Railroad Association (PTRA). An understanding of PTRA's organization and operation is necessary to a proper evaluation of the Navigation District's activities.

PTRA, an unincorporated association, was created in 1924 by an agreement between the Navigation District and six railroads which served the Port of Houston. It was formed to provide interchange rail facilities and switching services to the railroads on an impartial basis. Management of PTRA is formally vested in a Board of Control, consisting of five representatives from the Navigation District and one representative each from the eight railroads currently participating in the association. However,

on all matters relative to the operation of PTRA, each of the eight railroads may cast one vote while the Navigation District has only two votes. The Board of Control meets less than annually, and the day-to-day operation of the PTRA is controlled by an executive committee composed of representatives of the participating railroads.

PTRA owns property with an approximate value of $100,000. It leases property from the Navigation District including rights-of-way, trackage, switches, yards, and office buildings with a value between $10,500,000 and $11,000,000. PTRA pays the Navigation District 5% of the agreed value of the leased property annually as rent. The rolling stock and locomotives used by PTRA are furnished by the member lines, and it has the use of trackage in addition to that leased from the Navigation District under agreements with individual lines. The expenses of operating PTRA are borne by the member railroads on a pro-rata basis. PTRA makes no charge for movement of the cars of a member line, but does have a published tariff for moving cars for industries located in the area of its operation. PTRA is admittedly a common carrier by railroad and subject to FELA, as well as other federal rail carrier legislation.[8] On the other hand, it is not contested that the Navigation District and PTRA are distinct legal entities.

In its own operation, the Navigation District maintains certain railroad trackage at two facilities, a bulk materials handling plant and a public grain elevator.[9] The primary functions of these facilities is the unloading of in-

---

7. Article 8198, et seq., Article 8263a, et seq. Revised Civil Statutes of Texas.

8. PTRA is admittedly subject to the Railway Labor Act, and the Safety Appliance Act. It also complies with I.C.C. Rules and Regulations and has agreements with various railroad brotherhoods.

9. The Navigation District also maintains trackage at wharfside on which the loco-

motive cranes operate (see note 4 *supra*). Additional trackage is maintained in a service center, where material used by the Navigation District is retained. The trackage at the grain elevator, bulk materials handling plant, wharf apron, and service center is 'maintained' by the Navigation District in the sense that it is excluded from the lease of trackage to PTRA, and used exclusively by the Navigation District.

coming cargo, temporary storage, and conveyance of the cargo to vessels for loading. Any movement of railroad cars necessary to this unloading procedure is effected by employees of the Navigation District. PTRA equipment and employees do not operate on the property of the Navigation District.

Much of the testimony at the trial focused on the operations at the public grain elevator where the fatal accident occurred. At this facility, cars loaded with ship-bound grain are delivered by PTRA to a siding approximately 300 feet from the elevator. From the siding, the cars are moved on to dumpers by Navigation District employees using either electrically operated winches and cables or pneumatic tired tractors as a motive force. The grain is unloaded by the dumping mechanisms and the empty cars are rolled down an incline approximately 100 feet to a holding area. There the brakes on the cars are set and they are picked up later by employees of PTRA. The grain is moved to wharfside by means of a conveyor.[10]

■ A "common carrier by railroad", as used in FELA, " * * * mean[s] one who operates a railroad as a means of carrying for the public—that is to say, a railroad company acting as a common carrier. This view * * * is in accord with the ordinary acceptation of the words. * * *"[11] This general standard was illuminated by this court in Lone Star Steel Company v. McGee.[12]

■ In determining that Lone Star was a common carrier by railroad and within the ambit of FELA, the court reviewed authority relevant to the present question and determined several considerations to be of prime importance:

> First—[whether there is] actual performance of rail service, second—[whether] the service being performed is part of the total rail service contracted for by a member of the public, third—[whether] the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and fourth—[whether] remuneration for the service performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.[13]

In Lone Star, the steel company admitted that it performed rail services and the case turned on the last three consideration set out above. In the instant case, whether or not the Navigation District's activities constitute rail services is of central importance. In answering this question in the negative, the district court analogized the situation to three cases in which the courts have held that the intraplant movement of goods by rail did not make the industries involved rail carriers under

---

10. The testimony indicated that the same general unloading procedure is followed at the bulk materials handling plant.

11. Wells Fargo & Co. v. Taylor, 254 U.S. 175, 187, 41 S.Ct. 93, 65 L.Ed. 205 (1920).

12. 380 F.2d 640 (5th Cir.), cert. denied; 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967).

Lone Star Steel Company operated an extensive rail system within its industrial properties near Lone Star, Texas. It owned eight locomotives, 94 cars of rolling stock, six railroad cranes; and employed 57 persons in traditional railroad job classifications. In addition to the Lone Star plant, 14 independent companies maintained facilities within the Lone Star complex.

Rail service to the complex was provided by the T & N Railroad which was a subsidiary of Lone Star. By virtue of ownership of all but five shares of T & N's common stock, Lone Star had received in excess of $2,000,000 in dividends during the preceding ten years. Under its line-haul rates, T & N was obliged to pick up and deliver cars for industries located within the complex, at sidings located within the Lone Star plant. As to certain of these companies, Lone Star used its own railroad equipment to discharge T & N's obligation.

13. Id. at 647.

FELA.[14] More importantly, the court noted that the unloading of inanimate cargo is not ordinarily a railroad function.[15] Thus, the court reasoned that the movement of rail cars over a few hundred feet of track, incident to the unloading process at the Navigation District's facilities, is not a rail service. While the Navigation District may be a common carrier of a type, and engaged in interstate commerce, its carriage services are performed by conveyor and not by rail.

While this determination forecloses appellant's claim that the Navigation District is a rail carrier under FELA, consideration of the remaining Lone Star criteria reinforces the result reached by the district court. The services performed by the Navigation District are not a part of the total rail service contracted for by the public. The Kansas grain shipper, who appeared hypothetically throughout this case, does not receive the services of the Navigation District by virtue of his shipment contract with a railroad. The regular line-haul rate entitles the shipper only to transportation to the appropriate siding track. Independent arrangements must be made with the Navigation District and an additional charge paid in order to have the cars moved to the dumping mechanism and unloaded.

Appellant would have us attach considerable significance to the Navigation District's participation in PTRA. Initially it should be noted that the relationship between the Navigation District and PTRA does not approximate the control situation found in *Lone Star*.[16] PTRA is in fact controlled by its eight member railroads, and if characterization is necessary, PTRA is *their* alter ego. Further, the relationship between the Navigation District and PTRA is only relevant in determining whether the Navigation District holds itself out as a common carrier and cannot vicariously satisfy the requirement of actual performance of rail service which we have otherwise determined to be lacking.

The Navigation District makes no direct charge for the movement of rail cars incident to unloading. It charges one and one-half cents for the elevation of a bushel of grain. Though its costs, including the cost of moving rail cars, are included in this rate, the same charge is applicable whether the grain arrives by rail or motor carrier. The Navigation District also receives a rental payment of approximately $550,000 annually for the property leased to PTRA. However, the Navigation District does not participate in either profit or loss by PTRA, and the passive ownership of railroad property from which it derives income does not make the Navigation District a railroad.[17]

After consideration of the circumstances of the Navigation District's operation by the light of *Lone Star*, we are

14. Kelly v. General Electric Co., 110 F. Supp. 4 (E.D.Pa.), aff'd, 204 F.2d 692, cert. denied, 346 U.S. 886, 74 S.Ct. 134, 98 L.Ed. 390 (1953); Tilson v. Ford Motor Co., 130 F.Supp. 676 (E.D.Mich. 1955); Duffy v. Armco Steel Corp., 225 F.Supp. 737 (W.D.Pa.1964). Reliance on these cases is criticized by appellant on the ground that those companies were engaged in the rail movement of their own goods, and thus could not be *common* carriers by railroad. While there may be validity in this distinction, the cases are relevant for the limited proposition that the movement of rail cars does not invariably make one a railroad.

15. See Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct 826, 98 L.Ed. 1015 (1954); Pennsylvania Railway v. Kittaning Iron & Steel, 253 U.S. 319, 40 S.Ct. 532, 64 L.Ed. 928 (1920).

16. The absence of a control relationship between the Navigation District and PTRA also serves to distinguish the present case from Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). In that case the terminal company, which was found to be subject to ICC regulation, was controlled by a railroad through stock ownership.

17. *See* Robinson v. Baltimore & Ohio R. R., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849 (1915); Edwards v. Pacific Fruit Express Co., 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968).

convinced that the district court was correct in its determination that the Navigation District is not a "common carrier by railroad."

## II

■ Appellant's remaining allegations of error concern the form of the district court's findings and the substance of the final judgment awarding compensation under Texas law. There is no merit in appellant's contention that the court erred in refusing her request that it make separate findings of fact and conclusions of law. The 1946 amendment to Rule 52(a) Fed.R.Civ.Pro. makes it clear that the requirements of that rule can be satisfied by a memorandum or opinion of the court.

■ Finally, appellant contends that the district court, in awarding benefits under Texas law, erred in failing to include interest on past due installments of compensation and interest on the judgment from the date of entry.[18] It does not appear that appellant objected to this failure in the court below. She made no motion to amend the judgment under Rule 52(b) Fed.R.Civ.Pro., no motion for a new trial, and approved the judgment as to form.[19]

■ From the record on appeal, it is impossible to determine why interest was not included in the judgment of the district court; whether it is attrib-

utable to clerical error, oversight, or a reasoned determination that such an award would be improper.[20] Consequently, we are of the opinion that the ends of justice would best be served by remanding this question to the district court. In the event that the district court should determine that an award of interest is proper under Texas law and that such an award was erroneously omitted, we hereby grant leave to amend the judgment to include such interest.

Accordingly, the judgment is affirmed insofar as it dismisses the claim against the Navigation District based on FELA. The case is remanded for appropriate proceedings with respect to the question of interest in accordance with this opinion.

Affirmed and remanded.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before GEWIN, THORNBERRY and AINSWORTH, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

18. Article 8306a of the Revised Civil Statutes of Texas provides:

> * * * [W]here suits are legally brought by any claimant or beneficiary under any of the provisions of this Act and recovery is had for past due weekly installments, such claimant or beneficiary shall be entitled to recover interest on such past due installments at the rate of four (4%) per cent, compounded annually. Any judgment rendered pursuant to any of the provisions of this Act shall bear interest from the date it is rendered until paid at the rate of four (4%) per cent, compounded annually.

19. Generally appellate courts will not consider issues raised for the first time on

appeal. This principle is relaxed in cases where the question is one of law, and failure to hear it would result in a miscarriage of justice. American Surety Co. of N. Y. v. Coblentz, 381 F.2d 185 (5th Cir. 1967).

20. Appellee contends that in as much as it has never denied appellant's right to recovery of compensation benefits, has stood ready at all times to pay these benefits, and the benefits were refused by the appellant, any award of interest would have been improper. We are reluctant to consider this question of state law in the abstract with no findings in this regard having been made by the district court.