**S. FELICIONE & SONS FISH COMPANY, Inc., Plaintiff-Appellee,**

v.

**CITIZENS CASUALTY COMPANY OF NEW YORK, Defendant-Appellant.**

No. 28319.

United States Court of Appeals, Fifth Circuit.

July 23, 1970.

Rehearing Denied and Rehearing En Banc Denied Sept. 18, 1970.

William S. Frates, II, West Palm Beach, Fla., John T. Allen, Jr., Baya M. Harrison, III, St. Petersburg, Fla., for defendant-appellant; Harrison, Green, Mann, Davenport, Rowe & Stanton, St. Petersburg, Fla., of counsel.

Charles F. Clark, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, DYER and MORGAN, Circuit Judges.

DYER, Circuit Judge:

This bizarre saga of the seas—involving a double murder and ship scuttling by a drunkenly irrational master—is not only novelesque, but leaves novel legal consequences in its wake. It begins on November 9, 1967, when the MISS SONDRA LEIGH owned by plaintiff, S. Felicione & Sons Fish Company, Inc., under the command of Captain Lee Tindall, and with two crewmen on board, the rigman, Duhon, and an unidentified Mexican shrimp header, departed Port Isabelle, Texas, to fish for shrimp on the flats of Campeche, Mexico. She arrived about November 14, 1967, and fished the waters until November 18, 1967, when she, along with ten or fifteen other fishing vessels, congregated on the flats to discharge her catch into the vessel JUNE, a service boat which would take the catch into port.

The MISS SONDRA LEIGH dropped anchor in the vicinity of the JUNE about 3:30 P. M., some ten to twenty miles in the Gulf of Mexico in international waters. The ESTO FLEET, a 72 foot steel hulled vessel, commanded by Captain Frank Paprocki, was anchored about 150 yards to the starboard of the MISS SONDRA LEIGH. The shrimp was transferred from the MISS SONDRA LEIGH to the JUNE just before dark. During the transfer of the shrimp the ESTO FLEET came portside and made up to the MISS SONDRA LEIGH. Captain Paprocki emerged from the wheel house of the ESTO FLEET, apparently under the influence of alcohol, with a gun in one hand and a bottle of whiskey in the other. He shot

into the air and the water and then fired two shots into the galley and wheelhouse of the MISS SONDRA LEIGH. Captain Tindall told Captain Paprocki to stop shooting the gun. This request made Captain Paprocki mad and he began arguing violently with Captain Tindall.

Captain Paprocki then boarded the MISS SONDRA LEIGH and asked Captain Tindall and Duhon to drink with him. They refused. Captain Paprocki boarded the vessel portside to the MISS SONDRA LEIGH and then returned. He refused to disengage the ESTO FLEET, so the MISS SONDRA LEIGH got underway with the ESTO FLEET in tow. Duhon went below to prepare an ice bed for further shrimping. He heard two shots from the bow and, shortly after that, two shots by the hatch.

Duhom came topside and saw Captain Tindall dead, lying on the nets on the starboard side. The Mexican national was also dead, lying on the bow next to the hatch. Duhon ran to his sleeping quarters, grabbed a life jacket and, as he emerged, Captain Paprocki appeared from an after door of the ESTO FLEET and said "You .are next." Duhon jumped overboard. Paprocki fired twice but missed. Duhon was picked up about twelve hours later by a Mexican fishing boat.

On the next morning, November 19, 1967, Captain Grisham of the TOBY JEAN saw the ESTO FLEET towing the MISS SONDRA LEIGH tied up alongside, towards the open sea. The MISS SONDRA LEIGH was partially submerged and no one appeared to be on board her. Captain Grisham contacted Captain Paprocki by radio and was informed by him that the MISS SONDRA LEIGH had sprung a leak and that its crew was on the beach. Captain Paprocki appeared to be drunk, or at any rate not in a normal condition. Captain Grisham followed the ESTO FLEET.

Early in the afternoon Captain Grisham saw the MISS SONDRA LEIGH strung out aft of the ESTO FLEET on a single line, sunk down to her decks but still upright. Captain Paprocki pulled the MISS SONDRA LEIGH back and forth until he capsized her, cut his line to her, rammed her three times with the steel-hulled ESTO FLEET, and departed. Captain Grisham tied a buoy to the rudder shoe of the MISS SONDRA LEIGH and returned to Port Isabelle.

On November 20, 1967, the MISS SONDRA LEIGH was towed from twenty miles to within five miles offshore Mexico, at which time Captain Tindall's body was discovered chained inside the fishhold. The Mexican national's body was later discovered chained to the fuel tank.

The vessel was a constructive total loss. A survey showed that it had been rammed three times on the starboard side and two times on the port side while in a capsized position by a vessel with a V-shaped hull. The port side was holed in three areas. Two bullet holes were found aft of the hatch, favoring the starboard side of the pilot house, three in the overhead area and four bullet holes aft of the fishhold hatch in the aft deck near the center of the deck.[1]

The policy issued to plaintiff by defendant Citizens Casualty Company of New York provided coverage of the MISS SONDRA LEIGH in the familiar, aphoristic terms:

> Touching the adventures and perils which this Company is contented to bear and take upon itself, they are of the waters named herein, fire, lightning, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein.

The policy further provides:

> Notwithstanding anything to the contrary in this policy, this insurance is warranted free from any claim for loss, damage, or expense caused by or

---

1. As an epilogue we are told that Captain Paprocki and the ESTO FLEET vanished and have not been seen or heard from.

resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt threat or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise * * *.

Further warranted free 'from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy.

The District Court, trying the case without a jury, found as conclusions of law:

"1. When Captain Paprocki lashed down the bodies of the dead seamen to the MISS SONDRA LEIGH and towed her seaward, casting her away by towing her so as to sink her and then exhorting a final flourish by ramming her, he acted with force against the insured property with the intention of permanently depriving the owner of the property so as to fall within the provision of the policy insuring against loss from 'assailing thieves.'

Captain Paprocki was an assailing thief.

"2. The defense of piracy was not established. Captain Paprocki was not a pirate, nor did his actions fall within the ordinary definition of piracy. The actions of Captain Paprocki were more in the nature of irrational murder and an attempt to destroy the evidence than that of 'robbery, murder or forceable depredation on the high seas, without lawful authority, in the spirit and intention of universal hostility.' "

Final judgment was entered for the plaintiff for the full amount of the policy and this appeal ensued. The question of coverage of defendant's policy for the irrational conduct of Captain Paprocki is the sole issue to be determined in this appeal.

It is too well settled to require citation that the burden of proving a loss by a peril insured against is on the insured. To meet this burden Felicione, in the District Court, asserted that the loss was occasioned by "assailing thieves." Citizens defended in the District Court on the ground that the proximate cause of Felicione's loss was Paprocki's piratical act, a peril excluded in the policy. The District Court agreed with Felicione.

On appeal both parties assert alternative contentions which they did not raise below. Felicione would have us find that if the loss was not technically within the coverage of the "assailing thieves" provision it was caused by a "like peril" to that term, or by a like peril to barratry, or by a collision. Citizens now adds the argument that the vessel was captured, seized or taken, all of which were excluded perils. We decline the invitation of both parties to interpret and construe the recondite niceties of verbiage in an ancient clause of an insurance policy, none of which were presented to or decided by the lower court. We are content to limit our inquiry to what was decided below, *viz.*, was Paprocki an "assailing thief"? Since the burden is upon Felicione to prove the loss was caused by a peril specifically insured against, we need not determine whether the MISS SONDRA LEIGH was lost through a peril specifically excluded by the policy terms.

In this frame of reference the actions of Paprocki are pivotal. He and Captain Tindall were very close friends. He came aboard in an intoxicated condition with a fifth of whiskey in one hand and a gun in the other and wanted Captain Tindall and the crew to have a drink with him. They refused. He sat on the deck and continued drinking. Later, in an irrational condition, Paprocki murdered Tindall and one of the crew and attempted to murder the other crewman who avoided such a fate by jumping overboard with Paprocki blazing away at him. Then Paprocki sank the vessel. Under these conditions was Paprocki an assailing thief? We think not.

There was no evidence that Paprocki came aboard to steal or did steal anything from the MISS SONDRA LEIGH.

Nor was he bent upon stealing the vessel. Crazy as he was, Paprocki scuttled the vessel in an obvious attempt to cover up his heinous crimes.

■ We are convinced that the term "assailing thieves" in marine policies provides coverage for theft by force or violence of personal property on vessels, not coverage for the theft of the vessel itself. We have researched the subject exhaustively. All the authorities we found dealing with the term "assailing thieves" arise in the context of taking of goods aboard a vessel; none construe the term with reference to a taking of the vessel itself. *See, e. g.*, Swift v. American Universal Ins. Co., 1965, 349 Mass. 637, 212 N.E.2d 448 and cases there cited; Babbitt, Goode & Co. v. Sun Mutual Insurance Company, 1871, 23 La.Ann. 314; Annot., 19 A.L.R.3d 1150.

The term "assailing thieves" is of long standing, but has been infrequently defined. Its historical contour was succinctly developed in Swift v. American Universal Ins. Co., *supra*, (personal property valued at $3,600 taken from yacht cabin) where the court said:

> It appears that, in times long past, marine insurance policies covered losses at the hands of "Pirates, Rovers [and] Thieves." Beawes, Lex Mercatoria Rediviva, 245 (1754). Jacob, Law-Dictionary, Vol. II, Insurance, I, 1 (1797). The word "thieves" in marine insurance was held to apply to persons, not connected with the insured vessel, who committed thefts by force or violence in Marshall v. Nashville Marine & Fire Ins. Co., 20 Tenn. 99, 101 (1839). At approximately the same time, however, in New York, the meaning of "thieves" in marine insurance was held to include secret and nonviolent larceny even though committed by persons employed or working on the vessel. Atlantic Ins. Co. v. Storrow, 5 Paige, 285, 293 (N.Y.Ch., 1835); American Ins. Co. v. Bryan & Maitland, 26 Wendell 563, 573-574 (N.Y.Ct.Error, 1841).

In order to avoid the consequences of the construction given to the word "thieves" in the New York cases, marine insurers inserted the word "assailing" to modify the noun "thieves." 10 British Shipping Laws (Arnould, Marine Insurance [15th ed.]), par. 834. The term "assailing thieves" has been interpreted to include robbery by force and violence. Paddock v. Commercial Ins. Co., 2 Allen, 93, 101. Cleveland Twist Drill Co. (Great Britain), Ltd. v. Union Ins. Soc., 23 Lloyd, L.R. 50, 53 (C.A.). See Feinberg v. Insurance Co. of No. America, 161 F. Supp. 686 (D.Mass.), revd. on other grounds, 260 F.2d 523 (1 Cir., 1958). In our view the element of force or violence implicit in the phrase "assailing thieves" is not limited to violence against the person, as in robbery, but also includes force applied to the ship or to the insured goods in the perpetration of the theft. The construction was applied by the King's Bench to facts analogous to those in the instant case. See La Fabrique de Produits Chimiques Societe Anonyme v. Large, [1923] 1 K.B. 203, 208.

*Id.*, 349 Mass. at 640, 212 N.E.2d at 450.

In D. Winter, Marine Insurance (3rd Ed. 1952) the author in discussing theft of goods on board ship says:

> [M]any years ago no underwriter ever considered insuring against petty thievery, now commonly known as theft and pilferage. The underwriter was willing to protect a merchant against assailing thieves, against whose activities he was powerless to protect himself.

*Id.* at 87.

\* \* \* \* \* \*

The peril of thieves, as covered by the marine-insurance policy, is generally recognized by merchants and by the textbook writers as that of the taking of property by force, as distinguished from taking by stealth, which latter form of larceny is known by the specific term pilferage. It was always the intention of underwriters to

protect *property on vessels* from losses occasioned by the criminal acts of those who obtained access to the property by force. Pilferage, however, was not contemplated by the underwriter when property was insured, because such loss was supposed to be the result of the criminal acts of those who had a right to be with the property, such as stevedores or others who by stealth mingled with them and thus had access to the *goods*. Unfortunately, this theory and practice were overridden in certain state courts, where the judge, in an academic discussion of the meaning of the word "thieves," ignored for the most part the practice of the merchants and underwriters which, of old, was the basis on which marine-insurance law was determined and held that the word "thieves" covered what is commonly known in marine circles as pilferage. Accordingly, most policies in use in the United States have inserted the words "assailing thieves" in order to make clear the original and present intention of underwriters insuring against thieves. (Emphasis supplied)

*Id.* at 184. *See also* Arnould's Eleventh Edition § 837, at 1088.

We think that the paucity of authority construing the term "assailing thieves" with reference to theft of a vessel (as opposed to theft of goods on board) demonstrates that it was so generally understood that the term never contemplated theft of entire vessels that no effort was made before this case to litigate the point. If the "assailing

thieves" peril contemplated theft of the entire vessel, there would be no reason to provide protection, as was done in the policy involved in Feinberg v. Insurance Company of North America, D.Mass. 1958, 161 F.Supp. 686, vacated, 260 F.2d 523, against *both* "assailing thieves" *and* "theft of the entire yacht." We entertain no doubt that the term "assailing thieves" is limited to personal property aboard the vessel taken by force. It is a descriptive phrase, purposefully and precisely coined by the underwriters to distinguish between the theft of personal property by stealth, such as pilferage, and that taken by force. It has nothing whatever to do with insuring against the theft of an entire vessel.

 In the case *sub judice* it is undisputed that Captain Paprocki was a madman. But assuming that he had some degree of rationality when he came aboard the MISS SONDRA LEIGH, there is no evidence that he had any intention to steal nor did he steal any personal property from the vessel. Thus there was a complete absence of proof that there was coverage under the "assailing thieves" peril.

Concluding, as we do, that the loss of the MISS SONDRA LEIGH was not covered by a peril contemplated by either party or insured against in the marine policy issued by Citizens Casualty to Felicione, the judgment of the District Court is reversed and the cause is rendered.[2]

Reversed and rendered.

---

2. As we pointed out, we have declined to consider the arguments of Felicione made for the first time on appeal that the loss was a "like peril to that of assailing thieves," or was a like peril to that of "barratry," or was a "collision." Only to prevent a miscarriage of justice must we give heed to such hopefully bolstering afterthoughts. *E. g.*, McCrea v. Harris County Houston Ship Channel Navigation District, 5 Cir. 1970, 423 F.2d 605, 610 n. 19; American Surety Co. of New York v. Coblentz, 5 Cir. 1967, 381 F.2d 185. This is plainly not such a case and deserves but scant passing remarks. No one until now ever remotely considered collision coverage and properly so, because the MISS SONDRA LEIGH was a total loss *before* the vessel was rammed. The claim of barratry is frivolous because Paprocki was neither master nor mariner of the MISS SONDRA LEIGH. Moreover, the general words "all other like perils" cannot extend the scope of the policy to include perils beyond and entirely different from those specially enumerated. Feinberg v. Insurance Company of North America, 1 Cir. 1958, 260 F.2d 523, 527.

ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.